UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br>　　　　　Plaintiff,<br><br>vs.<br><br>RESEARCH, DEVELOPMENT AND TECHNICAL EMPLOYEES UNION,<br>　　　　　Defendant. | Civil Action No. 1:12-cv-11315 |

## COMPLAINT FOR DECLARATORY AND INUNCTIVE RELIEF

Plaintiff Massachusetts Institute of Technology ("MIT") hereby files this Complaint for declaratory and injunctive relief against defendant Research, Development and Technical Employees Union (the "RDTEU" or "Union") pursuant to 28 U.S.C. §2201 and Fed. R. Civ. P. 57 and 65.  MIT alleges as follows:

## PARTIES

1.　MIT is a co-educational, privately endowed research university located in Cambridge, Massachusetts.

2.　The Union is a labor organization which represents certain MIT employees in collective bargaining.

## JURISDICTION AND VENUE

3.　This is an action brought pursuant to 28 U.S.C. §2201 for declaratory judgment. Federal question jurisdiction exists under 28 U.S.C. §1331, 28 U.S.C § 2201, and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

4. Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in the District of Massachusetts, and pursuant to 29 U.S.C. § 185.

## NATURE OF THE ACTION

5. MIT is seeking a declaratory judgment that decisions concerning unescorted access to a restricted area at MIT's Nuclear Reactor Laboratory (the "Laboratory" or the "NRL"), as made by the Laboratory as a licensee of the U.S. Nuclear Regulatory Commission ("NRC"), are not within the scope of the collective bargaining agreement ("Agreement") between MIT and the RDTEU or arbitrable under that Agreement's grievance and arbitration procedure.

6. As discussed herein, the RDTEU has demanded arbitration regarding, among other issues, a decision by the Laboratory to deny authorization to Beth Rice, a member of the Union's bargaining unit, for unescorted access to the restricted area at the Laboratory that includes a six megawatt nuclear reactor and its surrounding containment building (collectively, the "Restricted Area").  Ms. Rice is employed by MIT's Environment, Health and Safety Office as a Project Technician (EHS).  When she was assigned to perform duties at the Laboratory, she was given authorization for unescorted access to the Restricted Area.  After MIT received a complaint that Ms. Rice had removed mail without permission from the mailbox of a colleague at the Laboratory with whom she had interpersonal conflicts, Ms. Rice was removed from the Laboratory and her authorization for unescorted access to the Restricted Area was revoked pending an investigation by MIT.  Based on that investigation, which included a review of security video recordings and interviews of Ms. Rice and others, MIT concluded that Ms. Rice twice removed mail from a mailbox that was not her own, conduct for which she did not offer

any legitimate explanation. The Laboratory subsequently concluded that Ms. Rice was not sufficiently trustworthy and reliable to retain authorization for unescorted access to the Restricted Area of the Laboratory and declined to reinstate that authorization.

7. A declaratory judgment from this Court is necessary because MIT and the Union dispute whether decisions regarding unescorted access to the Restricted Area of the Laboratory are within the scope of the grievance and arbitration provisions of their Agreement. Absent resolution by the Court, disputes over the arbitrability of decisions to deny authorization for unescorted access to the Laboratory may occur again.

## FACTS

8. The Laboratory is an interdepartmental university laboratory that operates a 6-megawatt nuclear research reactor (the "Reactor") in support of MIT's educational and research goals. The Reactor is surrounded by a containment building that houses certain items that support the Reactor's operations, including nuclear sources, low level waste, heavy water, and special materials that belong to the United States Department of Education.

9. The Laboratory is a licensee of the U. S. Nuclear Regulatory Commission, which has issued to MIT NRC Facility Operating License No. R-37.

10. The Laboratory uses the Reactor to support educational training and research in the areas of nuclear fission, engineering effects in biology and medicine, material studies, neutron physics, geochemistry and environmental studies. The Laboratory must operate the Reactor in a professional manner that is safe for students and staff, the public and the environment.

11. Following the terrorist attacks of September 11, 2011, the U. S. Nuclear Regulatory Commission took various actions to ensure the acceptability of individuals for unescorted access to nuclear research and test reactors, or RTRs.

12. On or about April 30, 2007, the U. S. Nuclear Regulatory Commission issued an order regarding access to RTRs entitled "Order Imposing Fingerprinting and Criminal History Records Check Requirements for Unescorted Access to All Research and Test Reactor Licensees" ("Order"), a true and accurate copy of which is attached as Exhibit 1. The U.S. Nuclear Regulatory Commission stated that the Order was implemented, in part, "to provide acceptable, additional assurance that an individual with unescorted access to a RTR facility will not adversely impact the common defense and security or the public health and safety." *See* Exhibit 1, p. 3.

13. The Order was provided to MIT on or about April 30, 2007 by James T. Wiggins, Acting Director, Office of Nuclear Reactor Regulation, U.S. Nuclear Regulatory Commission. A true and accurate copy of the cover memorandum from Acting Director Wiggins is attached as Exhibit 2.

14. The Order is applicable to MIT.

15. Under the Order, the Laboratory, as a licensee of the U.S. Nuclear Regulatory Commission, is responsible for making determinations regarding an individual's suitability for unescorted access to the Restricted Area (including the Reactor) and, specifically, whether to grant, or continue to allow, unescorted access. *See* Exhibit 1 (Attachment 2 thereto, ¶¶5-7). In making this determination, MIT must "determine whether the individual demonstrates a pattern of trustworthy and reliable behavior," which, among other things, may include consideration of the individual's employment history. *See* Exhibit 1, p. 2.

16. MIT's Environment, Health and Safety Office ("EHS") oversees compliance with occupational safety and health regulations on the MIT campus, including at the Laboratory.

17. Ms. Rice is employed by EHS as a Project Technician (EHS), and she was originally hired by EHS in January 2001.

18. During her employment by EHS, Ms. Rice was assigned duties at the Laboratory. Ms. Rice's duties included certain activities in the Restricted Area, and she was granted authorization for unescorted access to the Restricted Area, including the Reactor and its containment building.

19. On or about September 1, 2009, the Laboratory received a report from an employee at the Laboratory that, for the third time within a month, documents were missing from his mailbox in the Laboratory's reception area. In response to the complaint, the Laboratory reviewed closed-circuit security tapes of the reception area, which revealed Ms. Rice on two occasions removing documents from a mailbox that was not her own in the vicinity of the complaining employee's mailbox. As a result, EHS asked MIT's Human Resources Department to conduct an investigation (the "Investigation"), and Ms. Rice was placed on paid, administrative leave.

20. Pending the outcome of the Investigation, Ms. Rice's authorization for unescorted access to the Restricted Area in the Laboratory was revoked (the "Access Revocation"), and the security badge that had permitted her to access the Restricted Area was deactivated.

21. During the Investigation, Ms. Rice was interviewed twice regarding the allegations that mail had been removed from a co-worker's mailbox. In her initial interview, Ms. Rice said that she had "no recollection" of taking anything from anybody's mailbox and that she had never taken anything out of anyone else's mailbox without permission. In a follow-up

interview, Ms. Rice was shown the security tape and offered the opportunity to explain her actions. Ms. Rice acknowledged that she "seemed to be taking something from some mailbox," but she professed that she "had no idea or recollection" of what she was doing.

22. On October 5, 2009, EHS allowed Ms. Rice to return to work in her position as a Project Technician (EHS). Ms. Rice continued to perform her duties in that position, but because the Investigation was still ongoing and the Access Revocation remained in effect, Ms. Rice was assigned to work in areas of MIT outside of the Laboratory.

23. On or about November 19, 2009, MIT completed its Investigation and concluded that Ms. Rice had twice removed mail from an MIT mailbox that was not her own, without authorization. A true and accurate copy of MIT's Investigation Report is attached as Exhibit 3.

24. On November 25, 2009, based on the findings of the Investigation, EHS issued an oral warning to Ms. Rice in which she was advised that the Investigation had revealed that she had taken mail from a mailbox other than her own on two occasions without permission and that her conduct was unacceptable (the "Oral Warning").

25. On December 3, 2009, David Moncton, the Director of the Laboratory, received a letter from Louis DiBerardinis, the Director of the EHS, asking that Ms. Rice's unescorted access authorization for the Restricted Area of the Laboratory be reinstated (the "Reinstatement Request").

26. Thereafter, Director Moncton asked that the MIT Committee on Reactor Safeguard Special Subcommittee for Security ("MITRSC") provide a recommendation as to whether Ms. Rice's authorization for unescorted access to the Restricted Areas of the Laboratory should be reinstated in response to the Reinstatement Request. The MITRSC is a standing

6

committee charged with reviewing and ensuring compliance with safeguards associated with the Reactor's operation.

27. On January 11, 2010, members of the MITRSC met to discuss whether Ms. Rice was "sufficiently trustworthy" to allow her authorization for unescorted access to the Restricted Area to be reinstated.

28. After discussion of the Reinstatement Request, the MITRSC held a vote regarding the Committee's recommendation. During the vote, those members of the MITRSC who held positions at MIT with responsibilities relating to the Laboratory (including Director Moncton) abstained.

29. After the vote, the remaining members of the MITRSC unanimously recommended that Ms. Rice's authorization for unescorted access to the Restricted Area not be reinstated.

30. By letter dated January 21, 2010, Director Moncton notified EHS that Ms. Rice's unescorted access privileges to the Restricted Area of the Laboratory would not be reinstated.

31. Ms. Rice continues to work at MIT as a Project Technician (EHS), and she is currently assigned to areas of MIT campus other than the Laboratory. Although Ms. Rice no longer works in the Laboratory, she continues to perform duties within her job classification and within her work unit, EHS.

32. Ms. Rice's rate of pay and benefits were never changed as a result of the Investigation, the Oral Warning, or Access Revocation.

33. At all times relevant to this matter, MIT and RDTEU are parties to a collective bargaining agreement (the "Agreement"), which has been in existence for decades. A true and accurate copy of the Agreement in effect during the relevant time period is attached as Exhibit 4.

34. Ms. Rice is a member of the bargaining unit at MIT which is represented by the RDTEU, and Ms. Rice is thus an employee covered by the Agreement.

35. The Agreement provides a four-step grievance and arbitration procedure that applies "[i]n the event of any grievance between the employees and the Institute concerning the interpretation or application of this Agreement…" *See* Exhibit 4, Article IV.  As such, any grievance that does not concern an "interpretation or application" of the Agreement is not properly within the scope of the Agreement's grievance and arbitration procedure.

36. The Agreement provides that, if a grievance is not settled, then either party may submit the grievance to arbitration.  *See* Exhibit 4, Article IV.  In the event of an arbitration, the Agreement provides that "the arbitrator shall have no authority to add to, subtract from, or change or disregard any of the terms or provisions of this Agreement."

37. On January 25, 2010, the RDTEU initiated a grievance on behalf of Ms. Rice, contending that MIT did not have just cause to issue the Oral Warning to her or to assign her to work in other areas on the MIT campus other than the Laboratory (which the Union characterized as a "transfer") (the "Grievance").  A true and accurate copy of the Grievance is attached as Exhibit 5.

38. On March 11, 2010, in accordance with the grievance procedure in the Agreement, the Grievance was addressed at a Step 2 meeting among representatives of EHS, representatives of the Union, Ms. Rice, and a representative of MIT's Human Resource Office who was responsible for employment matters involving the EHS.  *See* Exhibit 4, Article IV.

39. On or about April 7, 2011, Mr. DiBerardinis, the Director of the EHS, sent a letter to the Union denying the Grievance (the "Grievance Denial").  A true and accurate copy of the Grievance Denial is attached as Exhibit 6.

40. On April 12, 2010, the RDTEU sent a letter to MIT stating that it was not satisfied with the results of the Step 2 meeting and requesting a Step 3 meeting. In this letter, the Union again claimed that Ms. Rice should not have received the Oral Warning and should not have been "transferred." A true and accurate copy of the April 12, 2010 letter is attached hereto as Exhibit 7.

41. On May 5, 2010, the Grievance was addressed again at a Step III meeting among representatives of EHS, representatives of the Union, Ms. Rice, and three representatives of MIT's Human Resource Office.

42. On May 6, 2010, the Union sent a letter to MIT stating that it was not satisfied with the results of the Step III meeting and was requesting arbitration of the Grievance. In this letter, however, and in addition to contesting the Oral Warning issued to Ms. Rice by EHS and her alleged "transfer," the Union asserted that it intended to grieve the Laboratory's decision to rescind her authorization for unescorted access to the Laboratory, which the Union characterized as a loss of "security clearance". A true and accurate copy of the May 6, 2010 letter is attached hereto as Exhibit 8.

43. On May 11, 2010, the RDTEU issued a Demand for Arbitration , a true and accurate copy of which is attached as Exhibit 9.

44. The issue of whether there is just cause for the Oral Warning given to Ms. Rice by EHS is an arbitrable issue under the Article XX of the Agreement. *See* Exhibit 4, Article XX ("No employee shall be demoted, discharged or otherwise disciplined without just and proper cause.")

45. The issues of whether Ms. Rice was "transferred" within the meaning of the Agreement, and, if so, whether there was proper cause for the alleged "transfer," are arbitrable

issues under Article XVIII of the Agreement.  *See* Exhibit 4, Article XVIII, §1(b)(defining a "transfer" as "the moving an employee laterally from one work unit to another in his/her own or a similarly rated classification") and §8(b)(providing that lateral transfer "shall be made only for proper cause").

46.    The decisions by the Laboratory to rescind Ms. Rice's authorization for unescorted access to the Restricted Area of the Laboratory and to decline to reinstate such authorization *are not arbitrable issues under the Agreement*.  No provision of the Agreement addresses the issue of authorization for unescorted access to the Restricted Areas of the Laboratory, and the Agreement does not provide a grievance and arbitration procedure related to decisions concerning authorization for unescorted access to Restricted Areas of the Laboratory.

47.    That portion of the Union's Grievance that seeks to challenge the decisions by the Laboratory to rescind and to not reinstate Ms. Rice's authorization for unescorted access to the Restricted Areas of the Laboratory does not concern "the interpretation or application" of any provision of the Agreement, and as such it is outside the scope of the Agreement's grievance and arbitration procedure.  See Exhibit 4, Article IV.  As such, the Union has no basis to engage in arbitration regarding the decisions to rescind and to not reinstate Ms. Rice's authorization for unescorted access to Restricted Areas of the Laboratory under the terms of the Agreement, and MIT has no contractual obligation to engage in an arbitration regarding those decisions.

## COUNT I: DECLARATORY JUDGMENT

48.    MIT realleges paragraphs 1 through 47 as if stated herein.

49.    An actual controversy has arisen between MIT and the Union relating to the arbitrability of the Union's Grievance to the extent that it seeks to challenge decisions to rescind

and to not reinstate Ms. Rice's authorization for unescorted access to the Restricted Area of the Laboratory.

50.  MIT is required to arbitrate only those issues that require the interpretation and application of the Agreement.

51.  No provision of the Agreement addresses the issue of authorization for unescorted access to Restricted Areas of the Laboratory.

52.  No provision of the Agreement reflects an agreement by MIT and the Union to arbitrate any issue relating to authorization for unescorted access to the Restricted Areas of the Laboratory.

53.  Requiring MIT to arbitrate any issue relating to authorization for unescorted access would be contrary to the Agreement, applicable law (including Section 301 of the Labor Management Relations Act, 29 U.S.C. §185), and public policy.

54.  MIT therefore seeks a declaration from this Court of the parties' respective rights and obligations under the Agreement and, specifically, that MIT has no obligation to arbitrate the issue of MIT's decision to deny authorization to Ms. Rice for unescorted access to the Restricted Area of the Laboratory.

## COUNT II: INJUNCTIVE RELIEF

55.  MIT realleges paragraphs 1 through 54 as if stated herein.

56.  MIT seeks a permanent injunction enjoining and restraining the Union from pursuing any claim in the arbitration relating to decisions to grant or deny authorization for unescorted access to the Restricted Area of the Laboratory.

57.  MIT will suffer irreparable harm if it is compelled to arbitrate claims it did not agree to arbitrate.

58.     MIT has no adequate remedy at law to prevent this harm.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff Massachusetts Institute of Technology respectfully requests that this Court enter such orders:

A.     Declaring that the Agreement between MIT and RDTEU excludes issues involving decisions concerning authorization for unescorted access to Restricted Area of the Laboratory;

B.     Declaring that the Union's Grievance concerning MIT's revocation of Ms. Rice's unescorted access to the Restricted Area of the Laboratory does not require interpretation and application of the Agreement and is thus outside the scope of the grievance and arbitration procedures of the Agreement;

C.     Declaring that MIT is not obligated to and cannot be required to arbitrate any issue relating to authorization for unescorted access to the Restricted Area of the Laboratory under the Agreement or the Labor Management Relations Act;

D.     Enjoining the Union from pursuing any claim in the arbitration relating to decisions to grant or deny authorization for unescorted access to the Restricted Area of the Laboratory; and

E.     Granting such other and further relief that the Court deems equitable and just.

                **MASSACHUSETTS INSTITUTE OF TECHNOLOGY**
                By its attorneys,

                /s/ *Scott A. Roberts*
                Scott A. Roberts, BBO No. 550732
                  sroberts@hrwlawyers.com
                Kristy L. Avino, BBO No. 658698
                  kavino@hrwlawyers.com
                Hirsch Roberts Weinstein LLP
                24 Federal Street, 12th Floor
                Boston, Massachusetts 02108
                Phone:  (617) 348-4300
                Fax:  (617) 348-4343

Dated: July 19, 2012