UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, <br>          Plaintiff, <br><br> vs. <br><br> RESEARCH, DEVELOPMENT AND TECHNICAL EMPLOYEES UNION, <br>          Defendant. | Civil Action No. 1:12-cv-11315 |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS

Pursuant to Federal Rule of Civil Procedure 12(c), plaintiff Massachusetts Institute of Technology ("MIT" or the "Institute") submits this memorandum of law in support of its Motion for Judgment on the Pleadings.

## INTRODUCTION

In its Complaint against the Research, Development and Technical Employees Union ("RDTEU" or the "Union"), MIT seeks declaratory judgment concerning the arbitrability of that part of a grievance filed by the Union that challenges MIT's decision to rescind and not reinstate an employee's authorization for unescorted access to a nuclear reactor on MIT's campus. The sole dispute in this case is whether the arbitration provision of the collective bargaining agreement between MIT and the RDTEU permits arbitration of the unescorted access issue, which is a matter of interpretation reserved for the court.

It is well settled that a party cannot be compelled to arbitrate issues that it did not agree to arbitrate. MIT cannot be compelled to arbitrate the issue of unescorted access because it agreed to arbitrate only those issues that require the interpretation and application of the Agreement,

because no provision of the Agreement, explicitly or implicitly, addresses the issue of

authorization for unescorted access, and because no provision of the Agreement reflects any

consent by MIT to allow a third-party arbitrator to decide this critical safety issue – one that has

been delegated by the U.S. Nuclear Regulatory Commission to MIT, and MIT alone.

Accordingly, MIT requests that this court issue a declaratory judgment that MIT has no

obligation to arbitrate any decision by the Institute to deny authorization for unescorted access to

its nuclear reactor.

## FACTS[1]

### *MIT's Nuclear Reactor*

MIT is a co-educational, privately-endowed research university located in Cambridge,

Massachusetts.  *Cp, ¶1; Answer, ¶1.*  In support of its educational and research goals, MIT has

an interdepartmental university laboratory – the Nuclear Reactor Laboratory (the "Laboratory")

– that operates a 6-megawatt nuclear research reactor (the "Reactor") under a license granted by

the United States Nuclear Regulatory Commission ("USNRC").  *Cp., ¶¶1, 8, 9; Answer, ¶¶1, 8,*

*9.*  The Laboratory uses the Reactor to support educational training and research in the areas of

nuclear fission, engineering effects in biology and medicine, material studies, neutron physics,

geochemistry and environmental studies.  *Cp., ¶10; Answer, ¶10.*

The Reactor is surrounded by a containment building that houses certain items that

support the Reactor's operations, including nuclear sources, low level waste, and heavy water

(the "Restricted Area").  *Cp., ¶¶6, 8; Answer, ¶¶ 6, 8.*  The Laboratory must operate the Reactor

in a professional manner that is safe for students and staff, the public and the environment.  *Cp.,*

---

[1]       The allegations are based on MIT's Complaint and the documents appended to or referenced in the
Complaint.   Citations to MIT's Complaint will be in the form "*Cp.*, ¶__."  The responses contained in the RDTEU's
Answer to the Complaint are cited in the form "*Answer*,  ¶___."

*¶10; Answer, ¶10.* MIT's Environmental Health and Safety Office oversees compliance with occupational safety and health regulations at the Laboratory. *Cp., ¶16; Answer, ¶16.*

### The USNRC's Order Regarding "Unescorted Access" To Nuclear Research Reactors

Following the terrorist attacks of September 11, 2011, the USNRC took various actions to ensure the acceptability of individuals for unescorted access to nuclear research and test reactors, such as the one at MIT. *Cp., ¶11, Answer, ¶11.* On or about April 30, 2007, the USNRC issued an order addressing the issue of unescorted access to research and test reactors (the "Order"). *Cp., ¶12, Answer, ¶12.*[2] The Order, which was provided to MIT by the USNRC and is applicable to MIT, states that it was implemented, in part, "to provide acceptable, additional assurance that an individual with unescorted access to a RTR [research and test reactor] facility will not adversely impact the common defense and security or the public health and safety." *See Cp., Exhibit 1, p. 3*; *Cp., ¶¶12, 13, 14; Answer, ¶12, 13, 14.* Under the Order, the Laboratory, as a licensee of the USNRC, is responsible for making determinations regarding an individual's suitability for unescorted access to the Restricted Area (including the Reactor) and, specifically, whether to grant, or continue to allow, unescorted access. *Cp., Exhibit 1 (Attachment 2 thereto, ¶¶5-7); Cp., ¶15; Answer ¶15.* In making this determination, the Order provides that MIT must "determine whether the individual demonstrates a pattern of trustworthy and reliable behavior," which, among other things, may include consideration of the individual's employment history. *Cp., Exhibit 1, p. 2; Cp, ¶15, Answer ¶15.*

### MIT's Investigation of a Complaint Involving Beth Rice, An  MIT Employee

Beth Rice ("Ms. Rice") was hired by MIT in 2001, and she is employed by MIT's Environmental Health and Safety Office ("EHS") as a Project Technician (EHS). *Cp.,¶¶6,17;*

---

[2]     A true and accurate copy of the Order is attached to as *Exhibit 1* to MIT's Complaint. *Cp.,¶12; Answer, ¶12*

*Answer, ¶¶6, 17.* During her employment by MIT, Ms. Rice was assigned duties at the Laboratory. *Cp., ¶18, Answer, ¶18.* Ms. Rice's duties included certain activities in the Restricted Area, and she was granted authorization for unescorted access to the Restricted Area, including the Reactor and its containment building. *Id.*

On or about September 1, 2009, Frank Warmsley III ("Mr. Warmsley"), the Laboratory's Operations Coordinator, made a complaint to Edward Lau ("Mr. Lau"), the Superintendent of Reactor Operations, that, for the third time within a month, documents were missing from his (Mr. Warmsley's) mailbox in the Laboratory's reception area. *Cp., ¶19, Answer, ¶19.*[3] MIT's Human Resources Department conducted an investigation into the complaint (the "Investigation"), during which Ms. Rice was twice interviewed by Lianne Shields, the EHS Human Resources Officer. *Cp., ¶¶19, 21; Answer, ¶¶19, 21.* While the investigation was pending, Ms. Rice was initially placed on paid administrative leave, her authorization for unescorted access to the Restricted Area in the Laboratory was revoked, and the security badge that had permitted her to access the Restricted Area was deactivated. *Cp., ¶19-20, Answer, ¶19-20.*

On or about November 19, 2009, Ms. Shields completed the Investigation and issued her Investigatory Report. *Cp., Exhibit 3; Cp.,¶23; Answer, ¶23.*[4] In the Investigatory Report, Ms. Shields stated, among other things, that she had reviewed a security video of the Laboratory's reception area, which "reveal[ed] that Beth [Ms. Rice] reached up and removed a document, from a mailbox that was not her own and that was in the vicinity and same row as Frank

---

[3]     The titles of Mr. Warmsley and Mr. Lau are reflected in an Investigation Report regarding this incident, a true and accurate copy of which is attached as *Exhibit 3* to MIT's Complaint.
[4]     The RDTEU does not deny the authenticity of the Investigation Report (Exhibit 3 to MIT'S Complaint), and states that the report "speaks for itself." *Cp.¶23; Answer,¶23.* In ruling on MIT's Rule 12(c) motion, this court may also consider the exhibits attached to MIT's Complaint, the authenticity of which the parties do not dispute. *Curran v. Cousins,* 509 F.3d 36, 44 n.5 (1st Cir.2007).

Warmsley's [mailbox]." *Cp., Exhibit 3, p. 5.*  Ms. Shields further reported that she had shown the

security video to Ms. Rice, stating:

> I showed the video to Beth and offered her an opportunity to explain her actions.
> While acknowledging that she seemed to be taking something from some
> mailbox, she stated that she had no idea or recollection of what she was doing.
> Beth was adamant that she hadn't taken the alleged missing documents from
> Frank Warmsley's mailbox. *Id.*

In the Findings of the Investigatory Report, Ms. Shield determined that "on two occasions Beth

removed paper or documents from a mailbox that was not her own and that were located in the

vicinity of Frank Warmsley's mailbox," and that Ms. Rice's behavior was "not appropriate and

should not reoccur." *Id.*

On or about November 20, 2009, EHS issued an oral warning to Ms. Rice (the "Oral

Warning"), which was memorialized in a November 25, 2009 memorandum from Lou

DiBerardinis ("Mr. DiBerardinis"), the Director of the EHS Office (the "Warning

Memorandum").  *Cp.*, ¶24, *Answer,* ¶24.[5]  Mr. DiBerardinis' Warning Memorandum stated, in

part:

> While the [I]nvestigation did not conclude that you had taken any of the missing
> mail from Warmsley's mailbox, it did reveal that on two occasions you had taken
> mail from a mailbox other than your own.  You were not able to indicate why you
> had done so and did not recall having anyone's permission to do so.  We
> discussed how this was an unacceptable practice and that you should not take mail
> from another's box without their permission.  *Roberts Aff., Exhibit 1 thereto.*

---

[5]      The RDTEU asserts that "[t]he document constituting the Oral Warning speaks for itself."  *Id.* Because the
Warning Memorandum was not attached to MIT's Complaint, it is filed herewith and attached as *Exhibit 1* to the
accompanying Affidavit of Scott A. Roberts ("Roberts Aff."). This court may consider the Warning Memorandum
in connection with MIT's Rule 12(c) motion without converting the motion to a summary judgment motion. *Curran
v. Cousins,* 509 F.3d at 44 (in evaluating Rule 12(c) motion,  court may consider documents the authenticity of
which are not disputed by parties, documents central to the plaintiffs' claim, and *documents sufficiently referred to in
the complaint*).

***The Laboratory's Director Denies a Request for Reinstatement of Ms. Rice's
Authorization for Unescorted Access to the Restricted Areas of the Laboratory***

On or about December 17, 2009, Mr. DiBerardinis sent a request to David Moncton,

Director of the Laboratory ("Director Moncton"), asking that Ms. Rice's unescorted access

authorization for the Restricted Area of the Laboratory be reinstated (the "Reinstatement

Request").  *Cp.*, ¶ 25, *Answer,* ¶25.

On January 11, 2010, a Special Subcommittee for Security of MIT's Committee on

Reactor Safeguard ("MITRSC") met and discussed the Reinstatement Request.  *Cp., ¶¶ 26, 28,

Answer, ¶¶, 26, 28.*   The MITRSC is a standing committee charged with reviewing and insuring

compliance with the safeguards associated with the Reactor's operations.  *Cp., ¶26, Answer, ¶26.*

As reflected by the minutes of the MITRSC meeting, "the Subcommittee's task was to make a

recommendation to the NRL [Laboratory] Director Moncton as to whether Ms. Rice is

sufficiently trustworthy to have her reactor access reinstated."  *Roberts Aff., Exhibit 2 thereto,

January 11, 2010 Minutes of the MITRSC Special Subcommittee for Security, p.2.*[6] After a

discussion on the issues of truthfulness, trustworthiness and security risk (which included a

review of the security videos depicting Ms. Rice removing items from the vicinity of Mr.

Warmsley's mailbox), the MITRSC's subcommittee held a vote regarding its recommendation to

Director Moncton, during which Director Moncton and two others with responsibilities relating

to the Laboratory abstained.  *Id.; Cp., ¶28, Answer, ¶28.*[7]  The three voting members of the

subcommittee "voted 3-0 to recommend to the NRL Director [Moncton] that Ms. Rice's access

---

[6]       The MITRSC's minutes are quoted in MIT's Complaint (¶27), and the RDTEU references the vote
reflected in these minutes in its Answer (¶29).  There appears to be no dispute regarding the authenticity of the
minutes or what they say, and they may be considered by the court in connection with MIT's Rule 12(c) motion.
See n. 5 above.

[7]       The MITRSC's minutes also reflect that one of the subcommittee members was absent.  *Roberts Aff.,
Exhibit 2 thereto, p. 1.*

to the secure areas not be reinstated." *Roberts Aff., Exhibit 2 thereto, p. 3; Cp., ¶29, Answer, ¶29.*

On January 21, 2012, Director Moncton sent a letter to Mr. DiBerardinis regarding the latter's request that Ms. Rice be provided unescorted access privileges to the Laboratory. Director Moncton stated that he had given the matter "serious consideration" but did not agree to the request. *Roberts Aff., Exhibit 3 thereto, January 21, 2010 letter from Director Moncton to Mr. DiBerardinis.*[8]

### *The RDTEU's Grievance on Behalf of Ms. Rice*

Although Ms. Rice no longer has unescorted access privileges for the Reactor and Restricted Areas, she remains employed by MIT as a Project Technician (EHS) and continues to work in areas other than the Laboratory. *Cp., ¶31, Answer, ¶31.*

Ms. Rice is a member of the bargaining unit at MIT which is represented by the RDTEU, and MIT and the RDTEU are parties to a collective bargaining agreement ("the Agreement") that has been in existence for decades. *Cp., ¶33, 34, Answer, ¶33, 34.* The Agreement provides a four-step grievance and arbitration procedure that applies "[i]n the event of any grievance between the employees and the Institute *concerning the interpretation or application of this Agreement…" Cp., Exhibit 4, Article IV* (emphasis added)*; Cp., ¶¶35, 36; Answer, ¶¶35, 36.* If a grievance is not settled, either party may submit the grievance to arbitration, but the Agreement provides that "the arbitrator shall have no authority to add to, subtract from, or change or disregard any of the terms or provisions of this Agreement." *Id.*

On January 25, 2010, the RDTEU initiated a grievance on behalf of Ms. Rice, contending that MIT did not have just cause to issue the Oral Warning to her or to assign her to work in

---

[8]     Director Moncton's January 21, 2010 letter is expressly referenced in MIT's Complaint, and the RDTEU states in its answer that the letter "speaks for itself." *Cp, ¶30, Answer, ¶30.* As such, the letter may be considered by the court in connection with MIT's Rule 12(c) motion. See n. 5 above.

other areas on the MIT campus other than the Laboratory (which the Union characterized as a "transfer") (the "Grievance").  *Cp., ¶37, Answer, ¶37.*  After the Grievance was addressed at a Step 2 meeting, Mr. DiBerardinis, the Director of the EHS, sent a letter to the RDTEU on April 7, 2010 denying the Grievance.  *Cp., Exhibit 6; Cp, ¶¶38, 39; Answer, ¶¶38, 39.*

On April 12, 2010, the RDTEU sent a letter to MIT stating that it was not satisfied with the results of the Step 2 meeting and requesting a Step 3 meeting.   In this letter, the Union again claimed that Ms. Rice should not have received the Oral Warning and should not have been "transferred."  *Cp., Exhibit 7; Cp, ¶40; Answer, ¶40.*  After the Step 3 meeting, the RDTEU sent a letter to MIT on May, 6, 2010 stating that it was not satisfied with the results of the meeting and was requesting arbitration of the Grievance.  *Cp., ¶42, Answer, ¶42.*  In this letter, in addition to contesting the Oral Warning issued to Ms. Rice by EHS and her alleged transfer, the Union also asserted that it intended to grieve what the Union characterized as the loss of Ms. Rice's "security clearance," a reference to the decision to rescind her authorization for unescorted access to the Restricted Areas of the Laboratory.  *Cp., Exhibit 8; Cp., ¶42, Answer, ¶42.*

On May 11, 2010, the RDTEU issued a Demand for Arbitration.  *Cp., Exhibit 9; Cp, ¶43; Answer, ¶43.*  In its Demand for Arbitration, the RDTEU stated that it intended to grieve: (1) the Oral Warning provided to Ms. Rice; (2) her "transfer" to work in areas other than the Laboratory; and (3) the rescission of her "security clearance."  *Cp, Exhibit 9.*  In addition to an order rescinding the Oral Warning and the transfer, the RDTEU has requested that the arbitrator issue an order "restor[ing]" Ms. Rice's "security clearance."  *Id.*

**ARGUMENT**

MIT and the Union agree that the issue of whether there is just cause for the Oral

Warning is an arbitrable issue under the Agreement.  *Cp., ¶44, Answer, ¶44.*[9]   MIT and the

Union likewise agree that the issues of whether Ms. Rice was "transferred" within the meaning

of the Agreement, and, if so, whether there was proper cause for the alleged transfer, are

arbitrable issues under the Agreement *Cp.*, *¶45, Answer, ¶45.*[10]

MIT and the Union disagree, however, whether the decisions to rescind Ms. Rice's

authorization for unescorted access to the Restricted Areas of the Laboratory and to decline to

reinstate such authorization are arbitrable under the Agreement. *Cp., ¶46, Answer, ¶46.*  For this

reason, MIT seeks a declaration from this Court of the parties' respective rights and obligations

under the Agreement and, specifically, that MIT has no obligation to arbitrate the issue of the

decision by MIT to deny authorization to Ms. Rice for unescorted access to the Restricted Area

of the Laboratory.

A.       ***Standard of Review***

When considering a motion for judgment on the pleadings under Rule 12(c), the court

must view the facts contained in the pleadings and the reasonable inferences therefrom in the

light most favorable to the non-moving party.  *Rivera-Gomez v. de Castro,* 843 F2d. 631, 635

(1st Cir.1988).  The court may "supplement the facts contained in the pleadings by considering

documents fairly incorporated therein and facts susceptible to judicial notice."  *R.G. Financial*

*Corp. v. Vergara-Nunez,* 446 F. 23d 178, 182 (1st Cir. 2006).  The court may also consider

---

[9]       The dispute regarding the Oral Warning would require interpretation and application of the provision in the Agreement providing that "[n]o employee shall be demoted, discharged or otherwise disciplined without just and proper cause," and is thus a proper subject for arbitration.  *See Cp., Exhibit 4, Article XX.*

[10]      While MIT denies that Ms. Rice was transferred within the meaning of the Agreement, it agrees that issues relating to her alleged transfer would require interpretation and application of two provisions of the Agreement (*see Cp., Exhibit 4, Article XVIII*, §1(b)(defining a "transfer" as "the moving an employee laterally from one work unit to another in his/her  own or a similarly rated classification") and §8(b)(providing that lateral transfer "shall be made only for proper cause")), and that those issues are properly the subject of arbitration.

documents about which the parties have no dispute regarding their authenticity or which are sufficiently referenced in the Complaint. *Curran v. Cousins,* 509 F.3d 336, 44 (1st Cir. 2007).

Here, MIT's motion is based upon those material facts in the pleadings that the RDTEU has admitted and the content of documents that it does not contest, including most significantly the Union's Grievance, its Demand for Arbitration, and the parties' Agreement. Because the material facts are not in dispute, and only a question of law remains for this court, this court may appropriately enter judgment on the pleadings. *See Aponte-Torres v. University of Puerto Rico,* 445 F. 3d 50, 54 (1st Cir. 2006).

**B.** **The Determination of Whether a Dispute Falls within the Scope of An Arbitration Provision is a Question for the Court.**

Requests for declaratory judgment are appropriate where there is a dispute between the parties as to the arbitrability of an issue under a collective bargaining agreement. See 28 U.S.C. § 2201(a). It is well settled that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Communications Workers,* 475 U.S. 643, 648 (1986) (internal citation omitted). "[E]xcept where the parties clearly and unmistakably provide otherwise, it is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning a particular matter." *Granite Rock Co. v. International Broth. of Teamsters*, 130 S.Ct. 2847, 2858 (2010) (internal citation and quotation marks omitted). *See also Shank/Balfour Beatty v. Int'l Bhd. of Elec. Workers Local 99,* 497 F.3d 83, 89 (1st Cir.2007) ("A dispute over whether an arbitration provision applies to a particular controversy raises an issue of substantive arbitrability that is presumptively for the courts, not the arbitrator, to decide"). "Where an arbitration clause in a collective bargaining agreement limits arbitration to those disputes which require interpretation of the agreement, as it does here, a grievance is excluded from arbitration unless it

10

*arises from a specific provision* of the agreement." *Rite Aid of Pennsylvania, Inc. v. United Food and Commercial Workers Union*, 595 F.3d 128, 132 (3d Cir. 2010) (emphasis added).  An arbitration proponent's contention that its grievance arises under a particular provision of a collective bargaining agreement is subject to "critical examination" by the court.  *Id.* "Unquestioning acceptance of the Union's characterization of its claims is inconsistent with [the court's] duty to determine arbitrability because it 'leaves the scope of the arbitration clause subject to the unilateral and unfettered discretion of the Union.'" *Id.*, *quoting E.M. Diagnostic Sys., Inc. v. Local 169*, 812 F.2d 91, 95 (3d Cir. 1987).

Here, as noted above, the parties do not dispute that the Agreement is applicable to Ms. Rice, nor do they dispute that the Union may arbitrate the issues of her receipt of an Oral Warning and her alleged transfer to other work areas, both of which require interpretation and application of particular provisions of the Agreement.  They dispute only whether MIT's revocation of Ms. Rice's unescorted access authorization to the Reactor and Laboratory requires interpretation or application any provision of the Agreement and is thus arbitrable.  That dispute presents a matter of substantive arbitrability that is properly for this court to determine.

### C.    *MIT's Decision to Deny Unescorted Access Privileges Is Not Subject to Arbitration Under the Agreement.*

Whether an employer may be compelled to arbitrate determinations regarding authorization for access to a nuclear reactor appears to be an issue of first impression in this Circuit.  However, the United States District Court for the District of New Jersey, in a decision upheld by the Third Circuit Court of Appeals, ruled in an analogous case that a dispute regarding denial of site access at a nuclear reactor was outside the scope of the applicable collective bargaining agreement and thus not subject to arbitration. *Public Service Elec. & Gas Co. v. Local 94 Intern. Broth. of Elec. Workers*, 140 F.Supp.2d 384 (D.N.J. 2001) ("*PSE&G*"), *aff'd*, 27

Fed.Appx. 127, 2002 WL 125586 (3d Cir.).   The reasoning and conclusion of the *PSE&G* court were subsequently followed in *In re WE Energies and International Brotherhood of Electrical Workers, Local 2150*, 122 Lab. Arb. (BNA) 1122, 2006 WL 2641749 ("*WE Energies*"), in which a labor arbitrator (at the request of the employer) determined that the issue of revocation of an employee's unescorted access to a nuclear reactor was not arbitrable under the applicable collective bargaining agreement.   Because the *PSE&G* and *WE Energies* case are significant precedents with respect to the issue that is now presented to this court, they are discussed at length below.

    **1.**  **The PSE&G Decision**

   In *PSE&G*, Forte, a union employee, worked at a nuclear power plant and held unescorted access privileges that permitted him to work in restricted areas of the plant.   *PSE&G,* 140 F. Supp. 2d at 386.   After Forte's third arrest for driving under the influence ("DUI"), his access privilege was suspended, and PSE&G provided him temporary work that did not require site access. *PSE&G,* 140 F. Supp. 2d at 387.   After Forte was convicted of DUI, PSE&G indefinitely continued the suspension of his access privilege for a period of months before discharging him.   *Id.*   Thereafter, Forte's union filed a grievance and commenced an arbitration as to whether there was just cause for his discharge.   *Id.*   The union and PSE&G disagreed whether the revocation of Forte's access privilege could be arbitrated, resulting in dueling motions for declaratory judgment in the federal district court.   For its part, PSE&G requested a declaration that its decision to revoke Forte's unrestricted access to the company's nuclear facilities was not subject to the arbitration provisions of the parties' collective bargaining agreement.   *Id.*   In its cross-motion, the union sought a declaration that site access was subject to arbitration and requested an order requiring PSE&G to submit the revocation of Forte's site

access to arbitration. *Id.*

The agreement in *PSE&G* contained an arbitration clause similar to the one in the

Agreement between MIT and the RDTEU, providing for arbitration of "any dispute or difference

... as to the interpretation, application, or operation of any provision of this Agreement."

*PSE&G,* 140 F. Supp. 2d at 391.[11]  The union argued that this arbitration provision "lends itself

to a very broad interpretation" and that, "even in cases involving narrow arbitration clauses, or

grievance subjects not covered by any particular clause of an agreement, the proper inquiry is

whether the grievance is *related to an interest* protected by the collective bargaining agreement

or whether there are any provisions, specific or otherwise, in the agreement relative to the issue

in dispute."  *PSE&G,* 140 F. Supp. 2d at 395 (emphasis added).  After reviewing the relevant

provisions of the collective bargaining agreement[12], however, the court ruled that site access

determinations were *not* within the zone of the union's protected interests under that agreement.

*PSE&G*, 140 F. Supp. 2d at 397-398.  In support of that conclusion, the court stated there was

"*no mention of site access authorization issues*" in the collective bargaining agreement and there

were "*no provisions, specific of otherwise, related to site access determinations.*"  *Id.* (emphasis

added).  The court went on to emphasize that given the "*unique and critical issue of the safety of*

*the public* at large regarding nuclear power plants, the Court deems it necessary and appropriate

that both [parties] *expressly agree to submit site access issues to arbitration* and that this be

*specifically provided in the CBA [collective bargaining agreement].*"  *PSE&G,* 140 F. Supp. 2d

---

[11]     The Agreement between MIT and the RDTEU expressly provides that, in the event of an arbitration, "the arbitrator shall have no authority to add to, subtract from, or change or disregard any of the terms or provisions of this Agreement."  *Cp., Exhibit 4, Article IV.*  By contrast, the collective bargaining agreement at issue in *PSE&G* contained no similar provision.  *PSE&G,* 140 F. Supp. 2d at 397.  As such, the MIT/RDTEU Agreement is *more restrictive* than the *PSE&G* collective bargaining agreement.

[12]     In addition to the aforementioned "dispute or difference" provision, PSE&G and the union agreed that two other provisions of the collective bargaining agreement were potentially relevant to the dispute, namely (1) a management rights clause, providing PSE&G the right to hire, suspend, and discharge for proper cause; and (2) a clause requiring that PSE&G uniformly enforce certain safety rules and regulations.  *PSE&G,* 140 F. Supp. 2d at 390-391.

at 400 (emphasis added).  In explaining its reasoning, the court wrote:

> The Court recognizes the interests of union members in their right to arbitrate whether proper cause exists for decisions affecting the terms and conditions of their employment. As admitted by PSE & G, whether proper cause existed for Mr. Forte's termination is subject to arbitration pursuant to the CBA. However, revocation of Mr. Forte's access authorization is a separate determination that is made pursuant to NRC regulations that require licensees, here PSE & G, to implement an access authorization program and an appeal procedure for denial or revocation of site access authorization. Though the appeal procedure may be a grievance/arbitration process provided in a collective bargaining agreement, it is also important to note that in light of the first principle governing the arbitrability of labor disputes, arbitration is a matter of contract and PSE & G is only required to submit to arbitration those disputes it has agreed to submit.  *Id.* (internal citations omitted).

Accordingly, the court concluded that site access disputes did not come within the scope of the collective bargaining agreement and granted PSE&G's request for a declaration that site access issues were not subject to arbitration. *PSE&G*, 140 F. Supp. 2d at 400, 406.[13]

## 2.    The WE Energies Decision

The *PSE&G* court's holding and reasoning were adopted by a labor arbitrator in *WE Energies*, a case that also addressed whether an employer's denial of site authorization access at a nuclear reactor was subject to arbitration under a collective bargaining agreement.[14]  The grievance in *WE Energies* concerned the employer's discharge of a nuclear power plant operator after his site access was revoked on the recommendation of an independent psychologist.  *WE Energies,* pp. 3-4.  The grievant was initially given a psychological test under the employer's access authorization program, and based on his answers to that test, he was asked to participate in a post-test psychological interview. *Id.*  During the interview, the grievant discussed his past

---

[13]      On appeal, the Third Circuit Court of Appeals affirmed, ruling that the trial court "correctly held that issues of site access for employees are not subject to arbitration under the grievance and arbitration provisions of the current collective bargaining agreement."  *PSE&G*, 27 Fed.Appx. at 127.

[14]      A true and accurate copy *WE Energies* is attached as *Exhibit 4* to the *Roberts Aff.*  Citations to *WE Energies* follow the page numbers in the attached copy.

disciplinary record and represented that he had received "one verbal counseling." *WE Energies,* p. 4. After the interview, the psychologist learned that the grievant in fact had a "rather lengthy history of written warnings for unsatisfactory work performance…." *Id.* Based upon the discrepancy between what the grievant had told the psychologist about his past discipline and what the documentary record actually revealed, the psychologist issued a recommendation that the grievant not be granted unescorted access to the nuclear reactor site. *Id.* The psychologist concluded that, because the grievant had been "dishonest" during the interview, "reasonable doubt exists that this applicant would discharge [his] duties in a safe and/or reliable or competent manner." *Id.* The grievant, without the ability to have unescorted access to the reactor, could not perform his duties as a plant operator. As a result, the employer terminated the grievant, noting that he had failed to fulfill the requirement that "employees who work at a nuclear power plant must be scrupulously honest and forthcoming." *WE Energies,* p. 4.[15]

The grievant's union responded by filing a grievance and commencing an arbitration, claiming that "the reasons provided for the denial of access and subsequent discharge do not justify the discharge." *Id.* The employer agreed that the issue of the grievant's discharge was arbitrable under the parties' collective bargaining agreement, but took the position that company's decision to deny the grievant unescorted access to a nuclear reactor was not a proper subject of arbitration. The employer asked the arbitrator to rule on the arbitrability of the access issue. *WE Energies,* pp. 5-6.[16]

---

[15]    Here, questions were also raised about Ms. Rice's trustworthiness and truthfulness. Unlike the grievant in *WE Energies,* however, Ms. Rice has not lost her job; she remains employed as a Project Technician (EHS) and continues to work at MIT in areas other than the Laboratory. *Cp., ¶31, Answer, ¶31.*

[16]    The arbitrator correctly noted that "there is legal precedent of considerable weight that would hold that arbitrability is the special domain of the courts, whereas issues related to merits in arbitration are, so to speak, the special purview of arbitrators." *WE Energies,* p. 5 n.7, *citing United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574 (1960). Nonetheless, the arbitrator stated that he had "jurisdiction to oblige" the employer's request. Here, like the employer in *PSE&G,* MIT has properly elected to seek a declaratory judgment from this court on the arbitrability of unescorted access.

In ruling on the employer's request, the arbitrator found that the collective bargaining

agreement between the parties was silent on the issue of access authorization and security

clearance for the nuclear reactor, and that he could "find nothing in the parties' Agreement that

deals with this crucial work place matter." *WE Energies,* pp. 6-7.  The arbitrator further found

that, although the parties' labor agreement had been in place for over three decades, the parties

had never addressed the issue of loss of access in their agreement, even though they could have

done so.  *WE Energies,* p. 7.  After noting the principal of arbitral construction that "management

keeps what it does not give away at the bargaining table," the arbitrator stated:

> In the instant case, that translates to mean that ***management of the nuclear power plant
> does not want to put decision-making about employee access to the plant to anyone but
> itself.  It has never bargained away its decision-making responsibility in this very
> narrow area*.**  Given the gravity of what could happen should the wrong person end up
> working in a critical position in a nuclear power plant that does not appear to be an
> impractical position on the part of the employer. *Id.* (emphasis added).

The arbitrator also drew a distinction between the grievant's discharge (which all agreed

was arbitrable) and "the very narrow issue of the underlying *cause*" of the grievant's discharge,

namely his loss of "unescorted access status" (about which the parties disputed arbitrability).

*WE Energies,* p. 6 (emphasis added).  While recognizing that many issues which result in

discharge are arbitrable (e.g., insubordination, theft, absenteeism, improper injury reports, sexual

harassment, threatening behavior), the arbitrator found that the issue of unescorted access to a

nuclear power plant presented an "exception."  *WE Energies,* p. 7.   In support of that conclusion,

the arbitrator stated:

> The issue raised in this case is an exception because of the ***critical nature of the work
> associated with unescorted access to the instant grievant's place of employment*…. *The
> possible repercussions of the behavior of an improperly screened employee working at
> a nuclear power plant could be far reaching with potential great danger to the
> public*…**  There are no absolutes in the personnel or human resources business but
> reasonable minds can but conclude that ***in a critical work environment the level of error
> when evaluating employees who work there must be reduced to minimum.  When a red***

*flag is raised, for whatever reason, it must be taken seriously.  Matters dealing with safety are paramount*.  *Id.*  (emphasis added).

The arbitrator recognized that while although there are not many issues concerning labor relations that parties hesitate to place in the hands of an arbitrator, "*unescorted access to a nuclear power plant is one of those issues*," particularly in light of the "gravity of what could happen should the wrong person end up working a critical position in a nuclear power plant…." *WE Energies,* pp. 7-8 (emphasis added).  The arbitrator also candidly stated that he was not in a position to second-guess the decision of experienced, management personnel with respect to who should or should not be provided access to a nuclear reactor, stating:

> [C]ommon sense dictates that the parties should have a healthy respect for the high probabilities that good decisions will be made when it is [a] question of access to a nuclear plant… *It appears to this arbitrator that it is simply less likely that a third party neutral could do as good, or as competent, a job as management personnel who have both experience in this matter and who are intimate with the procedures developed to arrive at, if not a perfect, than an optimally good decision related to unescorted access to a nuclear power plant.*  *WE Energies,* p. 8 (emphasis added).

In view of these considerations – the potential great danger of allowing the wrong person to enter a nuclear reactor, the absence of any evidence in the parties' labor agreement that the employer had bargained-away its decision-making responsibility in this critical area, and the fact that the arbitrator simply did not have the equivalent experience or expertise as the reactor's management to make decisions regarding access – the arbitrator determined that the issue of revocation of the grievant's unescorted access to the reactor was not arbitrable under the parties' labor agreement.  *Id.*

**3.     The MIT/RDTEU Agreement Does Not Provide For, and this Court Should Not Permit, Arbitration of the Issue of Unescorted Access.**

MIT and the RDTEU agreed to arbitrate only those issues "concerning the interpretation or application of" the Agreement, and further agreed that in the event of an arbitration, "the

arbitrator shall have no authority to add to, subtract from, or change or disregard any of the terms or provisions of this Agreement." *Cp., Exhibit 4, Article IV; Cp., ¶¶35, 36; Answer, ¶¶35, 36.* As such, the parties specifically limited the scope of the Agreement and did not agree to permit the arbitrator to expand that scope to include matters not delineated in the Agreement, such as the propriety of determinations for unescorted access to the Reactor. Like the labor agreements at issue in *PSE&G* and *WE Energies*, the MIT/RDTEU Agreement is silent on site access authorization, and there are no provisions in the Agreement, specifically or otherwise, that address the issue of access authorization. As such, any review of MIT's unescorted access determinations would require an arbitrator to exercise power over an extraordinary and unique safety issue that is not mentioned in the Agreement, explicitly or implicitly, and one for which MIT bears sole responsibility.

Under the Order issued by the USNRC, it is MIT – and MIT alone – that is delegated with the responsibility for making determinations regarding an individual's suitability for unescorted access to the nuclear research and test reactor on its campus. Under that Order, it is also MIT's obligation – and solely MIT's obligation – to determine whether an individual is sufficiently trustworthy and reliable to have such access. MIT has never bargained away its decision-making authority on this issue.

Under the exceptional circumstances in this case, there is no contractual basis and no valid justification for allowing an arbitrator to be put in the position of second-guessing those persons at MIT charged with determining whether to permit an employee to have unescorted access to a nuclear reactor. The stakes are simply too high. Here, there is no dispute that concerns were raised about Ms. Rice's behavior, resulting in the withdrawal of her unescorted access privilege, and those concerns were investigated by MIT. There is also no dispute that the

MITRSC's Special Subcommittee for Security, which is charged with safety at the Laboratory, considered whether Ms. Rice was sufficiently trustworthy to have her unescorted access privileges to the Reactor reinstated, and the Subcommittee voted 3-0 to recommend against her reinstatement, a recommendation with which the Laboratory's Director concurred after serious consideration. Even if the Union believes that this decision-making process on this crucial safety issue was not perfect, it must be respected. An arbitrator simply cannot be permitted to make a different decision, to restore Ms. Rice's "security clearance," and to order that she be allowed unescorted access to a critical work environment where MIT has determined she does not belong.

In sum, MIT does not seek to impede or impair the RDTEU's right to arbitrate those matters properly within the scope of the Agreement, namely the Oral Warning to Ms. Rice and her alleged transfer. Such arbitration is beneficial to all involved. But MIT cannot be forced to arbitrate a dispute that it did not agree to arbitrate, and the issue of unescorted access to its nuclear reactor is such a dispute.

## CONCLUSION

WHEREFORE, MIT respectfully requests that this Court grant its Motion for Declaratory Judgment and enter an Order:

A.      Declaring that the Agreement between MIT and the RDTEU excludes issues involving decisions concerning authorization for unescorted access to Restricted Area of the Laboratory;

B.      Declaring that the Union's Grievance concerning MIT's revocation of Ms. Rice's unescorted access to the Restricted Area of the Laboratory does not require interpretation and application of the Agreement and is thus outside the scope of the grievance and arbitration procedures of the Agreement; and

19

C.      Declaring that MIT is not obligated to and cannot be required to arbitrate any

issue relating to authorization for unescorted access to the  Restricted Area of the Laboratory

under the Agreement or the Labor Management Relations Act.

> **MASSACHUSETTS INSTITUTE OF TECHNOLOGY,**
> By its attorneys,
>
> /s/ Scott A. Roberts_____
> Scott A. Roberts (BBO # 550732)
> Kristy L. Avino (BBO # 658698)
> HIRSCH ROBERTS WEINSTEIN LLP
> 24 Federal Street, 12th Floor
> Boston, Massachusetts 02110

November 21, 2012                    Phone: 617-348-4300

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants by U.S. Mail on
November 21, 2012.

> /s/ Scott A. Roberts_____
> Scott A. Roberts

20