# American Arbitration Association

## VOLUNTARY LABOR ARBITRATION TRIBUNAL

In the Matter of the Arbitration between

RESEARCH, DEVELOPMENT AND TECHNICAL EMPLOYEES UNION
AND
MASSACHUSETTS INSTITUTE OF TECHNOLOGY

CASE NUMBER:    11-300-1012-10

### AWARD OF ARBITRATOR

THE UNDERSIGNED ARBITRATOR(S), having been designated in accordance with the arbitration agreement entered into by the above-named Parties, and dated and having been duly sworn and having duly heard the proofs and allegations of the Parties, AWARDS as follows:

> The grievance regarding the removal of access to the Grievant is substantively arbitrable.

_____  4/4/13
Arbitrator's signature (dated)

STATE OF
COUNTY OF          } ss.:

On this          day of          , 19          , before me personally came and appeared

to me known and known to me to be the individual(s) described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

FORM L14-AAA

RESEARCH, DEVELOPMENT AND          ARBITRATION OPINION AND
TECHNICAL EMPLOYEES UNION          DECISION


            AND


                                   GRIEVANCE:  BETH RICE – VERBAL
                                   WARNING/INVOLUNTARY TRANSFER/
MASSACHUSETTS INSTITUTE            RECISION OF SECURITY CLEARANCE
OF TECHNOLOGY


AMERICAN ARBITRATION
ASSOCIATION
CASE NO.  11-300-1012-10           DATE OF AWARD: April 4, 2013

---

This matter was presented to the undersigned Arbitrator at a hearing held on December 10, 2012 at the American Arbitration Association, Boston, Massachusetts. At the hearing, E. David Wanger, Esq. appeared for the Research, Development and Technical Employees Union (hereinafter referred to as the "Union"), while Jerome N. Weinstein, Esq. represented the Massachusetts Institute of Technology (hereinafter referred to as the "Employer" or "MIT").

At the hearing, as a result of a grievance (JX#2) being filed, three separate issues were discussed. Those were: 1) the removal of Ms. Rice's security clearance to enter the Nuclear Reactor Laboratory at MIT, 2) the transfer of Ms. Rice, and 3) the verbal warning given to Ms. Rice. The hearing held on December 10, 2012 was in regard solely to the removal of Ms. Rice's security clearance and the question of arbitrability as it related to this particular subject matter. It was also agreed that the issues of the transfer and the verbal warning would be held in abeyance until the arbitrability decision had been rendered.

Both parties submitted post-hearing briefs on the issue of arbitrability.

* * * * * *

## ISSUE

Is the grievance regarding the removal of Ms. Rice's security clearance arbitrable?

* * * * * *

## BACKGROUND

Individuals employed by MIT who are assigned to academic, administrative departments and sponsored research projects, among others, are members of the bargaining unit and a Collective Bargaining Agreement (JX#1) exists between the parties.

Ms. Rice was originally hired by MIT and assigned to work as a Project Technician in the Environment, Health and Safety (EHS) department.  It is the responsibility of this department to oversee compliance with occupational safety and

health regulations on the MIT campus, including the Nuclear Reactor Laboratory. During her employment by EHS, Ms. Rice was assigned duties in the Nuclear Reactor Laboratory which included certain activities in the Restricted Area. As a result, Ms. Rice was granted authorization for unescorted access to the Restricted Area, including the Reactor and its containment building.

On or about September 1, 2009, the Laboratory received a report from an employee at the Laboratory that documents were missing from his mailbox in the Laboratory's reception area. In response to the complaint, the Laboratory reviewed closed-circuit security tapes of the reception area. According to MIT, these tapes revealed Ms. Rice, on two occasions, removing documents from a mailbox that was not her own in the vicinity of the complaining employee's mailbox. MIT indicates that it conducted an investigation and at the conclusion, Ms. Rice's authorization for unescorted access to the Restricted Area in the Laboratory was revoked and the security badge that had permitted her access to the Restricted Area was deactivated.

In addition, Ms. Rice was allowed to return to work in her position as a Project Technician (EHS) outside the Laboratory which is claimed to be an involuntary transfer as well as receiving an oral warning. As was indicated previously, these two elements of this entire grievance are being held in abeyance pending the outcome of the arbitrability question regarding the removal of the security clearance of Ms. Rice from the Nuclear Reactor Laboratory.

In regard to the removal of the security clearance portion of the grievance, MIT filed a Complaint for Declaratory and Injunctive Relief in the United States District Court on July 19, 2012. On January 14, 2013 the disposition of the Federal District court stated

3

in part: "The Court will stay its hand and remand the matter to the Arbitrator for arbitration." Therefore, the question of arbitrability of whether or not MIT had the right to remove the security clearance from Ms. Rice is the subject before this Arbitrator at the present time.

\* \* \* \* \* \*

## POSITION OF THE EMPLOYER

The Employer contends that the only issue to be decided at this time is the question of whether or not its decision to rescind Ms. Rice's authorization for unescorted access to the Restricted Areas of the Laboratory and to decline to reinstate such authorization are arbitrable under the Agreement. According to the Employer, it has no obligation to arbitrate its decision to deny authorization to Ms. Rice for unescorted access to the Restricted Area of the Laboratory because it never agreed anywhere in the Agreement to relinquish its responsibility under the Order solely to determine issues of access.

It is contended by the Employer that whether an employer may be compelled to arbitrate determinations regarding authorization for access to a nuclear reactor appears to be an issue that has not been addressed by courts or labor arbitrators in this Circuit. However, the United States District court for the District of New Jersey, in a decision

4

upheld by the Third Circuit Court of Appeals, ruled in an analogous case that a dispute regarding denial of site access at a nuclear reactor was outside the scope of the applicable collective bargaining agreement and thus not subject to arbitration. *Public Service Elec. & Gas Co. v. Local 94 Intern. Broth. Of Elec. Workers*, 140 F. Supp. 2d 384 (D.N.J. 2001)("*PSE&G*"), *aff'd*, 27 Fed. Appx. 127, 2002 WL 125586 (3d cir.). The reasoning and conclusion of the *PSE&G* court were subsequently followed in *In re WE Energies and International Brotherhood of Electrical Workers, Local 2150,* 122 Lab. Arb. (BNA) 1122, 2006 WL 2641749 ("*WE Energies*"), in which a labor arbitrator (at the request of the employer) determined that the issue of revocation of an employee's unescorted access to a nuclear reactor was not arbitrable under the applicable collective bargaining agreement.

In *PSE&G,* Forte, a union employee, worked at a nuclear power plant and held unescorted privileges that permitted him to work in restricted areas of the plant. *PSE&G*, 140 F. Supp. 2d at 386. After Forte's third arrest for driving under the influence ("DUI"), his access privilege was suspended and PSE&G provided him temporary work that did not require site access. *PSE&G*, 140 f. Supp. 2d at 387. After Forte was convicted of DUI, PSE&G indefinitely continued the suspension of his access privilege for a period of months before discharging him. *Id.* Thereafter, Forte's union filed a grievance and commenced an arbitration as to whether there was just cause for his discharge. *Id.* The union and PSE&G disagreed whether the revocation of Forte's access privilege could be arbitrated, resulting in dueling motions for declaratory judgment in the federal district court. For its part, PSE&G requested a declaration that its decision to revoke Forte's unrestricted access to the company's nuclear facilities was not subject to the arbitration

provisions of the parties' collective bargaining agreement. *Id.* In its cross-motion, the union sought a declaration that site access was subject to arbitration and requested an order requiring PSE&G to submit the revocation of Forte's site access to arbitration. *Id.*

The agreement in *PSE&G* contained an arbitration clause similar to the one in the Agreement between MIT and the Union, providing for arbitration of "any dispute or difference ... as to the interpretation, application, or operation of any provision in this Agreement." *PSE&G*, 140 F. Supp. 2d at 391. The union argued that this arbitration provision "lends itself to a very broad interpretation" and that, "even in cases involving narrow arbitration clauses, or grievance subjects not covered by any particular clause of an agreement, the proper inquiry is whether the grievance is *related to an interest* protected by the collective bargaining agreement or whether there are any provisions, specific or otherwise, in the agreement relative to the issue in dispute." *PSE&G*, 140 f. Supp. 2d at 395 (emphasis added). After reviewing the relevant provisions of the collective bargaining agreement, the court ruled that site access determinations were *not* within the zone of the union's protected interests under that agreement. *PSE&G*, 140 f. Supp. 2d at 397-398. In support of that conclusion, the court stated there as "*no mention of site access authorization issues*" in the collective bargaining agreement and there were "*no provisions, specific or otherwise, related to site access determinations.*" *Id.* (Emphasis added). The court went on to emphasize that given the "*unique and critical issue of the safety of the public* at large regarding nuclear power plants, the Court deems it necessary and appropriate that both [parties] *expressly agree to submit site access issues to arbitration* and that this be *specifically provided in the CBA [collective bargaining agreement].*" *PSE&G*, 140 F. Supp. 2d at 400 (emphasis added).

6

The *PSE&G* court's holding and reasoning were adopted by a labor arbitrator in *WE Energies*, a case that also addressed whether an employer's denial of site authorization access at a nuclear reactor was subject to arbitration under a collective bargaining agreement. The grievance in *WE Energies* concerned the employer's discharge of a nuclear power plant operator after his site access was revoked on the recommendation of an independent psychologist. *WE Energies*, pp. 3-4. The grievant was initially given a psychological test under the employer's access authorization program, and based on his answers to that test, he was asked to participate in a post-test psychological interview *Id.* During the interview, the grievant discussed his past disciplinary record and represented that he had received "one verbal counseling." *WE Energies,* p. 4. After the interview, the psychologist learned that the grievant in fact had a "rather lengthy history of written warnings for unsatisfactory work performance…" *Id.*

Based upon the discrepancy between what the grievant had told the psychologist about his past discipline and what the documentary record actually revealed, the psychologist issued a recommendation that the grievant not be granted unescorted access to the nuclear reactor site. *Id.* The psychologist concluded that, because the grievant had been "dishonest" during the interview, "reasonable doubt exists that this applicant would discharge [his] duties in a safe and/or reliable or competent manner." *Id.* The grievant, without the ability to have unescorted access to the reactor, could not perform his duties as a plant operator. As a result, the employer terminated the grievant, noting that he had filed to fulfill the requirement that "employees who work at a nuclear power plant must be scrupulously honest and forthcoming." *WE Energies*, p. 4.

The grievant's union responded by filling a grievance and commencing an arbitration, claiming that "the reasons provided for the denial of access and subsequent discharge do not justify the discharge." *Id.* The employer agreed that the issue of the grievant's discharge was arbitrable under the parties' collective bargaining agreement, but took the position that the company's decision to deny the grievant unescorted access to a nuclear reactor was not a proper subject of arbitration. The employer asked the arbitrator to rule on the arbitrability of the access issue. *WE Energies,* pp. 5-6.

In ruling on the employer's request, the arbitrator found that the collective bargaining agreement between the parties was silent on the issue of access authorization and security clearance for the nuclear reactor, and that he could "find nothing in the parties' Agreement that deals with this crucial work place matter." *WE Energies,* pp. 6-7. The arbitrator further found that, although the parties' labor agreement had never addressed the issue of loss of access in their agreement, they could have done so. *WE Energies*, p. 7.

The arbitrator also drew a distinction between the grievant's discharge (which all agreed was arbitrable) and "the very narrow issue of the underlying *cause*" of the grievant's discharge, namely his loss of "unescorted access status" (about which the parties disputed arbitrability). *WE Energies*, p. 6 (emphasis added). While recognizing that many issues which result in discharge are arbitrable (e.g., insubordination, theft, absenteeism, improper injury reports, sexual harassment, threatening behavior), the arbitrator found that the issue of unescorted access to a nuclear power plant presented an "exception." *WE Energies,* p. 7. In support of that conclusion, the arbitrator stated:

The issue raised in this case is an exception because of the ***critical nature of the work associated with unescorted access to the instant grievant's place of employment… The possible repercussions of the behavior of an improperly screened employee working at a nuclear power plant could be far reaching with potential great danger to the public….*** There are no absolutes in the personnel or human resources business but reasonable minds can but conclude that ***in a critical work environment the level of error when evaluating employees who work there must be reduced to minimum. When a red flag is raised, for whatever reason, it must be taken seriously. Matters dealing with safety are paramount.*** *Id.* (Emphasis added).

The arbitrator recognized that while there are not many issues concerning labor relations that parties hesitate to place in the hands of an arbitrator, "*unescorted access to a nuclear power plant is one of those issues*," particularly in light of the "gravity of what could happen should the wrong person end up working a critical position in a nuclear power plant…." *WE Energies*, pp. 7-8 (emphasis added).

In view of these considerations – the potential great danger of allowing the wrong person to enter a nuclear reactor, the absence of any evidence in the parties' labor agreement that the employer had bargained-away its decision-making responsibility in this critical area, and the fact that the arbitrator simply did not have the equivalent experience or expertise as the reactor's management to make decisions regarding access – the arbitrator determined that the issue of revocation of the grievant's unescorted access to the reactor was not arbitrable under the parties' labor agreement. *Id.*

According to the Employer, MIT and the Union agreed to arbitrate only those issues "concerning the interpretation or application of" the Agreement, and further agreed that in the event of an arbitration, "the arbitrator shall have no authority to add to, subtract from, or change or disregard any of the terms or provisions of this Agreement." (JX#1). As such, the parties specifically limited the scope of the Agreement and did not

9

agree to permit the arbitrator to expand that scope to include matters not delineated in the Agreement, such as the propriety of determinations for unescorted access to the Reactor. Like the labor agreements at issue in *PSE&G* and *WE Energies*, the MIT-Union Agreement is silent on site access authorization, and there are no provisions in the Agreement, specifically or otherwise, that address the issue of access authorization. As such, any review of MIT's unescorted access determinations would require an arbitrator to exercise power over an extraordinary and unique safety issue that is not mentioned in the Agreement, explicitly or implicitly, and one for which MIT bears sole responsibility.

It is the position of the Employer that the Union claims that "denial of unescorted site access implicates *at a minimum* Articles IV, XVIII, XIX, and XX of the Agreement." (JX#7) (original italics). However, the Employer argues that the unescorted access very clearly does not require interpretation or application of these Articles (or any other Article in the Agreement). Article IV is the arbitration provision itself. Nothing about the mere existence of an arbitration provision requires arbitration of every dispute that arises. Article XVIII, "Promotions, Transfers, Vacancies, and Merit Increases," applies only to Ms. Rice's alleged transfer which MIT agrees is an arbitrable issue, not to permissible site access. For example, if an employee applied for site access and was denied, no one could reasonably call that denial a "transfer." Article XIX applies to "Layoff and Re-employment," which has no conceivable application to site access determinations. Finally, Article XX applies to "Demotion and Discipline." Ms. Rice was not discharged. Nor was she demoted, as her job description and benefits remain exactly the same as they were before. Denial of Ms. Rice's site access authorization in no way constitutes discipline – if it did, then every single employee that was ever denied site

access for any reason whatsoever could claim he or she was disciplined – an obviously incongruous result.

Presumably, the Union will attempt to link Ms. Rice's loss of site access to the Oral Warning that she received for taking mail from the mailboxes, and argue that it is further discipline for that misconduct, for which just cause must exist under the just cause provision of the Agreement. The critical determination whether site access should be granted, however, is separate and distinct from any issue of whether just cause exists for discipline. As noted by the court in *PSE&G*, "whether proper cause existed for [the employee's] termination is subject to arbitration pursuant to the CBA. However, revocation of [the employee's] access authorization is a separate determination that is made pursuant to NRC regulations that require licensees … to implement an access authorization program…" 140 F. Supp. 2d at 400.

In this case, the distinction is even clearer where the NRL and EHS are two different and distinct departments. Only EHS can discipline or assign work to its employees, and only NRL can grant or remove access to the Laboratory. It was EHS that issued Ms. Rice an oral warning – the only disciplinary act in this case and an issue that is admittedly arbitrable. In contrast, it was the NRL that reviewed and revoked Ms. Rice's unescorted access – an issue separate and distinct from EHS's oral warning to Ms. Rice. Such access denials are made due to concerns about trustworthiness or reliability, while discipline is taken because an employee has done something wrong and is issued a penalty. While the same underlying reason may result in both discipline and denial of access, as was the case here, that does not mean that a denial of security clearance is a form of discipline. If that were the case, an employee that was denied or lost security

11

clearance for some reason entirely unrelated to his or her job could seek arbitration of that decision contending that a refusal to grant clearance is discipline. Such a result makes no sense and the Union cannot reasonably contend that the distinct issue of site access is somehow arbitrable "discipline."

Under the Order issued by the USNRC, it is MIT – and MIT alone – that is delegated with the responsibility for making determinations regarding an individual's suitability for unescorted access to the nuclear research and test reactor on its campus. Under that Order, it has also MIT's obligation – and solely MIT's obligation – to determine whether an individual is sufficiently trustworthy and reliable to have such access. MIT has never bargained away its decision-making authority on this issue.

Under the exceptional circumstances in this case, there is no contractual basis and no valid justification for allowing a third party to be put in the position of second-guessing those persons at MIT charged with determining whether to permit an employee to have unescorted access to a nuclear reactor. The stakes are simply too high. Here, there is no dispute that concerns were raised about Ms. Rice's behavior, resulting in the withdrawal of her unescorted access privilege, and those concerns were investigated by MIT. There is also no dispute that the MITRSC's Special Subcommittee for Security, which is charged with safety at the Laboratory, considered whether Ms. Rice was sufficiently trustworthy to have her unescorted access privileges to the Reactor reinstated, and the Subcommittee voted 3-0 to recommend against her reinstatement, a recommendation with which the Laboratory's Director concurred after serious consideration. Even if the Union believes that this decision-making process on this crucial safety issue was not perfect, it must be respected. MIT simply cannot permit a

third party to make a different decision, to restore Ms. Rice's "security clearance," and to order that she be allowed unescorted access to a critical work environment when MIT has never bargained away its responsibility to decide who may and may not enter its nuclear reactor.

Based upon all the foregoing the Employer contends that it cannot be forced to arbitrate a dispute that it did not agree to arbitrate, and the issue of unescorted access to its nuclear reactor is such a dispute.

\* \* \* \* \* \*

## POSITION OF THE UNION

The Union contends that in accordance with the language contained in Article IV of the Collective Bargaining Agreement (JX#1-Tab1) a "grievance" is broadly described as involving the interpretation and application of the contract. Further, there is no itemization of subject matter excluded from the definition of grievance or from the arbitration provision, also contained in Article IV (JX#1 – Tab 1) which indicates that one submits an unresolved grievance to arbitration. According to the Union, if one reasonably can conclude that an issue involves the interpretation and application of a

contract provision, the issue, if unresolved, is arbitrable...doubts should be removed in favor of arbitration.

According to the Union, it also argues that while there is no uniformity of view, arbitrators generally have adopted as their standards for ruling on substantive arbitrability those enunciated by the United States Supreme Court in the "Trilogy" decisions:

- Does the grievances raise the type of dispute covered by the collective agreement's arbitration provisions;
- Is the moving party making a claim which, on its face, is governed by the collective agreement, an analysis clearly less probing than determining upon hearing whether the party is correct or not on the merits of the issue;
- Given the public policy favoring settlement of disputes through arbitration, the inquiry should be limited to whether there was agreement to arbitrate the type of dispute and, substantive arbitrability should be granted "unless it may be said with positive assurance that the arbitration clause is not susceptible to an interjection that covers the asserted dispute. Doubts should be resolved n favor of coverage (arbitrability)" Steelworkers v. Warrior and Gulf Navigation Co., 80S. Ct. 1347, 1353; 34LA 561, 564-565 (1960).

The Union further contends that any Employer argument based upon a grant by the government of a "nondelegable" prerogative to determine access to secured areas related to the nuclear reactor must be subject to the same presumptive standards as above related. If there existed a statute or a properly enacted (by statutory authority) agency rule or regulation mandating that only persons deemed "trustworthy" should have such access and that the determination of such characteristic is solely for the employer as a licensee to make...if there were a grant of such explicitly stated, non-delegable prerogative, then the Employer could assert with some reason that the Arbitrator is without power to evaluate and to reverse such determination. There is no such explicit

grant of non-delegable power on this record...the Employer's determination of an employee's honesty and the impact of such determination on terms and conditions of employment generally are cognizable under the contractual generic discipline provisions and nothing on this record serves to justify a different analytical standard regarding the Grievant's access issue. Doubts should be resolved in favor of arbitration.

In regard to the instant matter, there is a dispute about the imposition of discipline upon Ms. Rice.

The Union's arbitration submission related a contention "that Ms. Rice should not have received a verbal warning, nor should she have been transferred, nor have lost her security clearance and that the Institute is in violation of Articles XVIII (Transfer), XX (Discipline) and other relevant clauses of the contract". The Arbitration demand identifies as the nature of the grievance "...Improper issuance of verbal warning and involuntary transfer, improper recession of security clearance, and other employer conduct in all violation of contract."

In its Step II grievance answer, the Employer tied all of such issues into one neat package:

> "Both parties acknowledge that the change in assignment occurred after Ms. Rice's access to Nuclear Reactor Lab was withdrawn by the NRL (Nuclear Reactor Lab) and that this occurred following Ms. Rice's receiving the informal warning."

In its Step III response, the Employer adopted the phrase "oral warning" but otherwise repeats the packaging: after issuance of the warning it was determined not to reinstate unescorted access and "(a)s a result, because she lacked the requisite access to continue working at the NRL, EHS (her group) reassigned her to other duties as a Project Technician within EHS." The Employer argued at Step III "that it had just cause to issue

15

the oral warning for the Grievant's behavior" and it was that behavior which prompted the access denial and it was that access denial which required her reassignment (the Employer rejecting the concept of the Grievant's having been transferred within the meaning of Article XVIII).

According to the Union, one reasonably can conclude that but for the Employer's determination as to just cause for the warning, Ms. Rice would not have been denied access and reassigned (transferred).

The nature of the dispute centers upon the propriety of the discipline imposed, the warning, the denial of access and the consequential transfer (reassignment); that is, Ms. Rice was moved from the NRL because she could not gain access and she could not gain access because the Employer issued the warning for rationale constituting the Employer's just cause determination.

The elements of the issues raised by this grievance appear inseparable in substantive context; however, in its complaint to the federal district court, the Employer asserted that while both the oral warning and the transfer issues are arbitrable, the third leg of the impose discipline, the access denial causing the transfer and arising from the circumstances prompting the oral warning, is  not substantively arbitrable because it is not specifically covered by any contract provision (Cf. Complaint, paragraphs 44-47).

Does denial of access sufficiently involve the interpretation or application of one or more of the foregoing provisions (note, while specifically identifying Articles XVIII and XX), the Union's grievance included reference to "other relevant clauses of the Agreement", (JX#2, Tab 2) so as to survive the Employer's substantive arbitrability challenge?

One can argue that management must exercise its rights provided by Article III in a reasonable and nonarbitrary manner. Thus, it is a reasonable application of a reasonable working rule to deprive an employee access based upon determination of her not being generally trustworthy within a given set of alleged and yet to be proven misconduct, and, if the misconduct as alleged is proven, it is of such a caliber so to result in such a rule imposition, or in a reassignment ("right to assign") or a transfer ("right to transfer") such as what occurred in this case?

The Union asks: if denial of access triggers reassignment, and if such reassignment impairs an employee's ability to earn overtime as she previously did when access had been in place, is that an arguable violation of the equitable overtime entitlements as suggested in Article V, p. 16?

Further questioning: where an inter-unit, lateral transfer is made because of allegations of wrongdoing and the resultant denied of access, is such for proper cause as related in Article XVIII – Part 8 b; that is, does denial of access equate with the "proper cause" standard on this record?

Regarding the "discipline" nexus to the arbitrability of the access denied, note please the broad scope of Article XX "…or otherwise disciplined without just and proper cause" (emphasis supplied). All three parts of the dispute, the oral warning, based upon allegations of wrongdoing, resulting in access denial, which in turn resulted in the Grievant's being transferred (reassigned) are captured by the phrase "otherwise disciplined", and the penalties imposed include economic harm in terms of overtime

entitlement and damage to professional reputation, impairing the Grievant's marketability within the nuclear industry and community.

Finally, if denial of access is argued to be predicated upon some administrative ruling so as to impair application of any of the foregoing contract provisions, does that not trigger the operation of Article XVI. If so, does the Employer, who is sponsoring such theory, have an obligation to implement the Article XVI provisions, and, if so, does the Employer's failure to do so vitiate the penalties imposed upon Ms. Rice, including access denial?

One or more of these contract theories may be a stretch; however, the Union argues that it does not have to be correct on the merits as to any of the above theories of contract interpretation and application to prevail in this substantive arbitrability stage. The Employer's burden in challenging arbitrability requires a finding, without doubt, that none of the above theories of contract interpretation and application apply to the access denial issue. That is a significant burden not satisfied on this record.

The Union contends that the record is replete with allegations impuning the honesty and integrity of Ms. Rice, and the disciplinary penalties imposed including access denial, are characterized as having just and sufficient cause rationale based upon such allegations.

Further, the Employer relates that since Ms. Rice retained her classification and associated compensation, she has not been harmed... "Ms. Rice continues to work at MIT as a Project Technician (EHS), and she is currently assigned to areas of MIT campus other than the Laboratory. Although Ms. Rice no longer works in the Laboratory, she

continues to perform duties within her job classification and within her work unit, EHS. Ms. Rice's rate of pay and benefits were never changed as a result of the investigation, the oral warning, or access revocation" (Employer complaint to the federal district court, paragraph's 31 and 32).

The measure of the impact of an employer's action upon an involved employee in terms of innocuousness or harmfulness is relevant in determining whether such action is tantamount to discipline and cognizable under a contract clause giving such action is tantamount to discipline and cognizable under a contract clause giving such the employer the right to discipline for just and sufficient cause. Here, the Employer appears to assert the proverbial no harm-no foul context. In fact, the oral warning – access denial – reassignment (transfer) continuum of Employer action has significantly harmed Ms. Rice and should be viewed, in the aggregate, as discipline emanating from a common set of accusations, all within the parameters of contract Article XX and, thus, arbitrable.

Ms. Rice's professional reputation within the specialized grouping of businesses and employee units involved in nuclear related work foreseeably is impacted negatively by accusations of not being honest and trustworthy and by denial of access to a nuclear reactor facility. The honesty/trustworthiness qualifications are related by the Federal Nuclear Regulatory Commission as a requisite standards for work in this field and this Employer's negative evaluation of Ms. Rice in such regard clearly is a stain upon her reputation in this relatively select, small community of professionals.

As related in the Employers federal court complaint, the U.S. Nuclear Regulatory Commission's orders, such as those imposing finger printing and criminal history records

review for persons having unescorted access to nuclear research and test reactors (RTR's) facilities were imposed "to provide acceptable, additional assurance that an individual with unescorted access to a RTR facility will not adversely impact the common defense and security or the public health and safety" (Paragraph 12, quoting from EX#7, Tab 9). Referencing that same source, determinations as to unescorted access are to include "whether the individual demonstrates a pattern of trustworthy and reliable behavior", and, the Employer says that in making such a determination, an individual's employment history is relevant (CF. Paragraph 15, federal court complaint, and EX#7).

According to the Union, Ms. Rice's work from 2001 until September, 2009, including her intact unescorted access, would seem to be relevant employment history, germane to any "trustworthy" assessment, and even if one could prove that she twice (in a very short time interval) invaded another's mail cubby without, on either occasion, removing any identifiable object, does that evidence a "pattern of conduct nullifying such positive employment history? Is the Employer entitled to make such determination unilaterally, with absolute immunity from neutral review pursuant to a negotiated provision requiring just and sufficient cause for imposition of discipline?

Based on the foregoing, the Union argues that this allows for the reasonable conclusion that Ms. Rice has been disciplined, that is, that she has suffered penalty, having been determined to be an offender....the Employer agrees that for two-thirds of the penalty, such discipline can be reviewed pursuant to the contractual grievance/arbitration procedure, but, for the access denial component, the Employer asserts that such penalty is immune from neutral review.

In making that assertion the Employer may argue that it afforded Ms. Rice a review process regarding access denial such that, on balance, that penalty was imposed with some attention to some degrees of fairness. The Union respectfully suggests that process was nothing more than an internal, unilateral reaffirmation, having no resemblance to a bilateral, neutral and balanced adjudication.

The Union further contends that one member of the special subcommittee for (Nuclear Reactor) Security, Professor Apostolakis is quoted in the minutes as relating that "...in industry/government security investigations, a person whose access is not granted is normally not given the reasons" (EX#5, Tab 7, Paragraph 8.). Here, of course, Ms. Rice and the Union have been given the purported reason for the access denial herein issue. This affirms the absence of government involvement in denying Beth Rice access to continue the duties for which she was hired and which she performed without issue for almost a decade.

The Employer made the access decision based upon its HR conducted investigation. In the United States Nuclear Regulatory Commission order imposing figure printing and criminal history records check requirement for unescorted access (EX#7, Tab 9), applicable to the Employer's nuclear reactor laboratory, the site of the job for which Ms. Rice was hired and where she worked without difficulty until the events giving rise to this case, there is no provision whereby the grant of unescorted access are to be regarded as unassailable.   Absent such explicit constraints, the presumption favoring neutral resolution of dispute should prevail in terms of substantive arbitrability.

Based on all the foregoing, the Union argues that the access denial is substantively arbitrable.

\* \* \* \* \* \*

The pertinent provisions contained in the Collective Bargaining Agreement (JX#1, Tab #1) are as follows:

## ARTICLE VI

### Settlement of Grievances

**Grievance Procedure.** This Agreement sets forth the basic terms and conditions of employment and is intended to continue the present and good relationships between the Institute, its employees, and their Union. In the event of any grievance between the employees and the Institute concerning the interpretation or application of this Agreement, the representatives of both agree to make prompt and earnest efforts to settle such matter. All grievances shall be handled as follows:

**Step 4:**

If settlement is not reached in Step 3, then either party may by written notice to the other demand that the grievance be submitted to arbitration, provided that such notice is given within thirty (30) days after the Institute has given its final answer in Step 3. The parties shall attempt to agree upon an arbitrator, but if agreement is not reached within three (3) working days, the matter shall be submitted to an arbitrator appointed

under the rules of the American Arbitration Association. The decision of the arbitrator shall be final and binding upon both parties, except that he arbitrator shall have no authority to add to, subtract from, change, or disregard any of the terms or provisions of this Agreement…

## ARTICLE XVIII
### Promotions, Transfers, Vacancies, and Merit Increases

8. **Transfers.**

   a. **Transfers Between the Campus and the Lincoln Laboratory.**
      When the Institute desires to transfer an employee laterally from the Campus to the Lincoln Laboratory, or vice versa, the Institute agrees such transfer shall not conflict with other provisions of the Agreement and agrees to conform to the procedure for filling vacancies, Part 3 above, unless the Union agrees to waive these requirements. Such waiver shall be in writing and signed by the principal officers of the Union.

   b. **Other Transfers.**
      The Institute shall not be required to follow these procedures in making lateral transfers from one work unit to another work unit or from one Campus organizational unit to another campus organizational unit. However, such transfers shall be made only for proper cause and not to diminish the promotional opportunities, job security or layoff and recall rights of the employee transferred or of other employees.

      No employee shall be transferred without his/her consent where the employee's seniority rights are adversely affected to a substantial degree.

      The foregoing does not apply to transfers resulting from the transfer of work from one organizational unit to another or from organizational changes such as the combining of two

23

organizational units into one, the movement of functions, operations or activities from one organizational unit to another, the formation of new organizational units by combining functions, operations or activities previously performed by several organizational units and so forth.

### ARTICLE XX
### Demotion and Discipline

No employee shall be demoted, discharged, or otherwise disciplined without just and proper cause.

\* \* \* \* \* \*

### DISCUSSION

In a letter from Mr. David Gay, President of the Union, to Mr. Jonathan Barnes, Manager of Labor Relations, dated May 6, 2010 (JX#2C he states in part:

The Union contends that Ms. Rice should not have received a verbal warning, nor should she have been transferred, nor have lost her security clearance and that the Institute is in violation of Articles XVIII, XX and other relevant clauses of the Agreement.

24

In the opinion of this Arbitrator, this statement forms the basis for the grievance at issue in this case. While both parties agree that the issues dealing with the verbal warning and the transfer are arbitrable issues, before we get to those issues the question of whether or not the loss of the security clearance or her denial of authorization for unescorted access to a restricted area (including a nuclear reactor) is substantively arbitrable and must be first decided.

After a careful analysis of the language contained in Article V (JX#1, Tab 1) it clearly and unambiguously states: "...In the event of any grievance between the employees and the Institute concerning the interpretation or application of this Agreement...". Also, after a very careful search through the language contained in the Agreement (JX#1, Tab 1) it is the opinion of this Arbitrator that there is no discussion contained therein regarding the denial of authorization for unescorted access to a restricted area. Consequently, the arguments advanced by the Employer in its brief indicating that, as such the grievance should be found to be not arbitrable since the grievance language only permits grievances regarding the interpretation or application of this Agreement to be somewhat meritorious. However, it is the opinion of this Arbitrator that this argument should not be the controlling one in this particular case because of three reasons.

First, the grievance includes specific articles which the Union contends have been violated (i.e. Article XVIII and Article XX) along with that standard catch all phrase "and other relevant clauses of the Agreement". Therefore, it is the opinion of this Arbitrator that the grievance does deal with specific clauses contained in the Agreement and those which he must address in this part of the case. As indicated previously in this discussion,

Article XVIII, which deals with transfers is not particularly relevant in this particular portion of the case. However, it is the opinion of this Arbitrator that the language contained in Article XX is particularly relevant. While the action of the removal of Ms. Rice's unrestricted access in and of itself is not considered to be a disciplinary action, it is clear that in this case it was considered to be discipline. The reason for this is that the removal was directly tied to her alleged taking of mail which resulted in her receiving an oral warning which in turn and as a direct result of this caused the Employer to remove her unrestricted access. This is evident because of the specific wording in Mr. Louis DiBerardinis', Director, Environment, Health and Safety letter to Mr. James Daley (JX#2b) which states:

> Both parties acknowledge that the change in assignment occurred after Ms. Rice's access to the Nuclear Reactor Lab was withdrawn by the NRL and that this occurred following Ms. Rice's receiving the informal warning. (Emphasis added).

Further, in a letter from Mr. Barnes to Mr. Alan Morrison, Secretary RDTEU dated July 16, 2012 regarding a Step 3 meeting which was held on May 5, 2010 (JX#28) he states in part:

> The Institute argued at the third step meeting that it had just cause to issue the oral warning for the Grievant's behavior. The Grievant did not explain her behavior observed in the surveillance tape, and her statements that she did not remember and in fact did not take any documents from any other employee's mailbox were inconsistent with her actions seen on the surveillance tape. The surveillance tape clearly shows the Grievant taking documents from a mailbox other than her own. Taking material from another's mailbox and refusing or failing to provide any explanation for such conduct is inappropriate and cannot be condoned.

It is the opinion of this Arbitrator that 1) there is no question that the oral warning issued to Ms. Rice was disciplinary in nature, and 2) the removal of her access was a direct result of this oral warning (which has not yet been adjudicated) due to her alleged removal of documents from a mailbox which was not assigned to her. Therefore, this removal of her access must be considered to be disciplinary in nature and is, therefore, directly tied to the language contained in Article XX of the Collective Bargaining Agreement (JX#1).

Second, there is no doubt that the United States Nuclear Regulatory Commission (USNRC) issued an order imposing fingerprinting and criminal history records check requirements for unescorted access to all research and test reactor licenses. (EX#7, Tab 9). In addition, it is clear that MIT is the licensee in accordance with USNRC. According to this document all those with unescorted access (which obviously included Ms. Rice) are required to submit to fingerprinting and a criminal records history – which presumably was completed in this case. The reason for this is "to provide acceptable, additional assurance that an individual with unescorted access to a RTR facility will not adversely impact the common defense and security or the public health and safety." (EX#7, Tab 9, Section 11, Paragraph #7). In addition to this, there is no question that in accordance with the Order imposing fingerprinting and criminal history records check (EX#7, Tab 9) the following statement is contained in EX#7, Tab 9, Attachment #2:

> The Licensee's reviewing official is required to evaluate all available information in making a determination of unescorted access, including the criminal history record information pertaining to the individual as required by the NRC Order. The criminal history records check is used in the determination of whether the individual has a record of criminal activity that indicates that the individual should not have unescorted access as defined in the associated Order. Each determination of unescorted access,

27

which includes a review of criminal history information, must be documented to include the basis for the decision made.

It is the opinion of this Arbitrator that while the preceding grants the Employer the right to determine whether or not access is to be denied, as in this case, the denial must be for specific and valid and reliable reason(s). Further, in making the decision one has to also consider the language contained in this Order (EX#7, Tab 9, Section 2, Paragraph 3) which states in part:

> The background investigations and checks at a minimum verify identity, nationality, immigration status (if applicable), and determine whether the individual demonstrates a pattern of trustworthy and reliable behavior through facility-specific verification of various aspects of a person's background. (Emphasis added).

The question then becomes did the alleged actions by Ms. Rice demonstrate a pattern of trustworthy and reliable behavior, etc.? In order to determine this, an investigation of the events leading up to her removal of access must be undertaken which can only take place if this portion of the grievance is found to be arbitrible.

Third, it must be found that the grievance regarding the denial of access, is, in the opinion of this Arbitrator, the type of dispute which can and should be raised by the agreement's arbitration provision. Further, contained in the Steelworkers Trilogy cases which were decided by the United States Supreme Court, it is clear that substantive arbitrability questions should be granted unless it may be said with positive assurance that the arbitration clause is not susceptible to an investigation that covers the asserted dispute. Doubts should be resolved in favor of coverage (arbitrability) Steelworkers v. Warrior and Gulf Navigation Co., 80 S. CT. 1347, 1353: 34 LA 561, 564-565 (1960).

This Arbitrator is very cognizant that in *WE Energies* the Arbitrator indicated that unescorted access to a nuclear power plant is an issue dealing with critical consequences if placed in the hands of the wrong person. However, it is the opinion of this Arbitrator that due to the specific circumstances as discussed in the foregoing and since the Collective Bargaining Agreement contains no provision which prohibits the grievance regarding the denial of access to proceed to arbitration, it must be found that the grievance regarding the denial be found to be substantively arbitrable.

\

29

\* \* \* \* \* \*

## **AWARD**

The grievance regarding the removal of access to the Grievant is substantively arbitrable.

April 4, 2012

Craig E. Overton
Arbitrator