UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
 ─────────────────────────── )
                             )
MASSACHUSETTS INSTITUTE OF   )
TECHNOLOGY,                  )
                             )
          Plaintiff,         )
                             )        CIVIL ACTION
                             )        NO. 12-11315-WGY
          v.                 )
                             )
                             )
RESEARCH, DEVELOPMENT AND    )
TECHNICAL EMPLOYEES UNION,   )
                             )
          Defendant,         )
 ─────────────────────────── )
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                    November 4, 2013

I.   **INTRODUCTION**

The plaintiff, the Massachusetts Institute of Technology ("MIT"), brings this action against the Research, Development and Technical Employees Union (the "Union"), seeking declaratory judgment that the revocation of unrestricted access to a nuclear research facility is not an arbitrable grievance under the collective bargaining agreement MIT has with the Union, and asking the Court to enjoin the Union from arbitrating the unrestricted access revocation issue.

**A.    Procedural Posture**

MIT commenced this action against the Union on July 19, 2012.  Compl. Declaratory Injunctive Relief ("Compl."), ECF No. 1.  The Union filed its answer along with an assented-to motion for leave to file the answer late on September 14, 2012.  Answer, ECF No. 8; Assented-To Mot. Leave File Answer, ECF No. 7.  The Court granted the motion to file by order on September 17, 2012.  Elec. Order, Sept. 17, 2012, ECF No. 9.  On November 21, 2012, MIT filed a motion for judgment on the pleadings accompanied by a supporting memorandum.  Pl.'s Mot. J. Pleadings, ECF No. 20; Pl.'s Mem. Law Supp. Mot. J. Pleadings ("Mem. Supp."), ECF No. 21.  Along with the motion for judgment on the pleadings, MIT also filed a supporting affidavit of Scott A. Roberts, its counsel, accompanied by a series of attachments.  Aff. Scott A. Roberts Supp. Pl.'s Mot. J. Pleadings ("Roberts Aff."), ECF No. 22.  On December 12, 2012, the Union filed an opposition to the motion for judgment on the pleadings.  Def.'s Opp'n Mot. J. Pleadings ("Opp'n"), ECF No. 26.

On January 10, 2013, this Court heard argument on MIT's motion for judgment on the pleadings and issued an oral order to "stay its hand and remand the matter to the Arbitrator for arbitration," including a determination of the arbitrability issue, but permitted either side to move to re-open the administratively closed case upon completion of the arbitration.

2

Elec. Clerk's Notes, Jan. 10, 2013, ECF No. 28. The parties briefed the issue of arbitrability of unescorted access for the Arbitrator and the Arbitrator issued his award finding arbitrability of the issue on April 4, 2013. <u>See</u> Pl.'s Status Report ("Status Report"), Ex. 1, Award Arbitrator ("Award") 30, ECF No. 30-1. On May 3, 2013, MIT requested a case management conference and filed an accompanying status report apprising the Court of the developments in the case. Pl.'s Request Case Mgmt. Conference, ECF No. 31; Status Report. A status conference was held on May 14, 2013, and the Court decided to hear argument at its motion session on June 3, 2013 and took the matter under advisement thereafter. <u>See</u> Elec. Clerk's Notes, May 14, 2013, ECF No. 33; Elec. Clerk's Notes, June 3, 2013, ECF No. 35.

**B.  Factual Background**

**1.  Facts As Alleged**

MIT is a co-educational, privately endowed research university with a location in Cambridge, Massachusetts. Compl. ¶ 1. The Union is a labor organization representing a number of MIT's employees in collective bargaining. <u>Id.</u> ¶ 2. As part of its research facilities, MIT maintains an interdepartmental Nuclear Reactor Laboratory (the "Laboratory"), which operates a six-megawatt nuclear research reactor (the "Reactor") under a license granted by the United States Nuclear Regulatory Commission (the "Commission"). <u>Id.</u> ¶¶ 8, 9. The Reactor and its

3

surrounding containment building constitute a restricted area ("Restricted Area"), to which access rights, in particular unescorted access, are limited to specially authorized employees. Id. ¶¶ 6, 8.

MIT is subject to an order (the "Order") issued by the Commission in April 2007, which imposes fingerprinting and criminal history record check requirements for unescorted access on its licensees.  Id. ¶¶ 12, 15; Compl., Ex. 1, Order Imposing Fingerprinting & Criminal History Records Check Requirements Unescorted Access All Research Test Reactor Licensees Identified Attach. 1 (Effective Immediately) ("Order"), ECF No. 1-2.  The Order places the duty of determining whether an individual may have, or may continue to have, unescorted access on a licensee's reviewing official.  Order 5-6.  Furthermore, the Order stipulates that in making this determination, the reviewing official must "determine whether the individual demonstrates a pattern of trustworthy and reliable behavior . . . ."  Id. at 2.

Ms. Rice ("Rice") is employed by MIT's Environment, Health and Safety Office as a Project Technician.  Compl. ¶¶ 6, 17.  She was formerly assigned to perform certain duties at the Laboratory, and for that purpose was given unescorted access to the Restricted Area.  Id. ¶¶ 6, 18.  In September 2009, one of Rice's colleagues lodged a complaint with the Laboratory alleging that Rice removed mail from his mailbox three times without the

authority to do so.  Id. ¶ 19.

Thereupon, MIT's Human Resources Department conducted an investigation during which time Rice's authorization for unescorted access to the Restricted Area was temporarily revoked. Id. ¶¶ 19, 20.  On or about November 19, 2009, MIT completed the investigation into the colleague's complaint and concluded that Rice had twice removed mail without authorization from another employee's mailbox.  Id. ¶ 23.  The next week, Rice received an oral warning.  Id. ¶ 24.  Also, the subcommittee responsible for reactor security found Rice not "sufficiently trustworthy" to have unescorted access to the Restricted Area and voted unanimously not to restore her access authorization.  Id. ¶¶ 6, 27, 29.  Rice continues to work at MIT as a Project Technician, performing duties commensurate to her job classification, but has since been assigned to areas other than the Laboratory.  Id. ¶ 31.

During the relevant time period, MIT and the Union were parties to a collective bargaining agreement (the "Agreement"),[1] and Rice is a member of the bargaining unit at MIT that is represented by the Union, and thus is an employee covered by the Agreement.  Id. ¶¶ 33, 34.  The Agreement sets forth a four-step

---

[1] The Agreement in the version submitted to the Court was effective for the years 2008 to 2011.  Compl., Ex. 4, 2008-2011 Agreement Mass. Institute of Tech. & Research, Development, & Technical Employees' Union ("Agreement"), ECF No. 1-5.

grievance and arbitration procedure which applies "[i]n the event of any grievance between the employees and MIT concerning the interpretation or application of [the] Agreement . . . ." Id. ¶ 35; Agreement 4-6.   The Union initiated a grievance on behalf of Rice, the grievance procedure was exhausted, and the Union - unsatisfied with the results - submitted the matter to arbitration.   Compl. ¶¶ 37-43.   MIT concedes the arbitrability of the issues of whether there was just cause for the oral warning given to Rice and whether Rice was "transferred" within the meaning of the Agreement and, if so, whether it was for proper cause.   Id. ¶¶ 44, 45.   MIT contends, however, that the temporary revocation of unescorted access to the Restricted Area and the decision to decline reinstatement of Rice's authorization are not arbitrable under the Agreement.   Id. ¶ 46.

### 2. The Arbitrator's Award

The Arbitrator scrutinized the Agreement, specifically Article IV, containing the arbitration clause, Article XVIII, regulating, inter alia, transfers, and Article XX, relating to discipline, and opined that the Agreement contained no language regarding the denial of authorization of unescorted access to the Restricted Area.   See Award 25-27.   The Arbitrator concluded that while the language of the arbitration clause only permits arbitration of grievances "regarding the interpretation or application of [the] Agreement," and the fact that the Agreement

is silent on the unescorted access issue seems to counsel against arbitrability of this issue in view of the arbitration clause's language, see id. at 25, the revocation of unescorted access under the circumstances of this case amounted to discipline and thus implicated Article XX of the Agreement, see id. 25-27.  As additional ground for his reasoning, the Arbitrator considered the Order's language and opined that the denial of unescorted access "must be for specific and valid and reliable reason(s)," and the determination of whether Rice showed a "pattern of trustworthy and reliable behavior" necessarily relied on "an investigation of the events leading up to her removal of access . . . which [could] only take place if this portion of the grievance" was arbitrable.  Id. at 28.  Lastly, the Arbitrator reasoned that doubts as to questions of arbitrability should be resolved in favor of arbitration and as the Agreement "contains no provision which prohibits the grievance regarding the denial of access to proceed to arbitration," the issue must be substantively arbitrable.  Id. at 28-29.

### C.    Federal Jurisdiction

The Court has federal question jurisdiction over this declaratory judgment action pursuant to 28 U.S.C. section 1331, 28 U.S.C. section 2201, and section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

## II.  ANALYSIS

7

**A.   Legal Standard**

MIT has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) ("Rule 12(c)"), a motion that can be filed at any time "[a]fter the pleadings are closed – but early enough not to delay trial. . . ."  Fed. R. Civ. P. 12(c).

Since a motion for judgment on the pleadings under Rule 12(c) ultimately fulfils the same function as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), the standards for decision are very much alike.  See Curran v. Cousins, 509 F.3d 36, 43-44 (1st Cir. 2007) (explaining that a motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss).  The Court thus is charged with assessing the merits of the case by viewing all facts in the light most favorable to the non-moving party, here the Union, and drawing all reasonable inferences therefrom.  R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006) (citing Rivera-Gomez v. DeCastro, 843 F.2d 631, 635 (1st Cir. 1988)).

To succeed with its motion and attain a declaratory judgment on the pleadings, MIT must include in its complaint enough factual allegations to "raise a right to relief above the speculative level", assuming all factual allegations are true. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see

8

Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).
In that sense, unlike a motion under Rule 12(b)(6), a motion
under Rule 12(c) "implicates the pleadings as a whole" rather
than solely drawing from the complaint.  Curran v. Cousins, 482
F. Supp. 2d 36, 41 (D. Mass. 2007) (Lindsay, J.), aff'd, 509 F.3d
36 (1st Cir. 2007)(internal quotation marks omitted) (citations
omitted).

    "[Q]uestions of statutory interpretation are questions of
law ripe for resolution at the pleadings stage."  Simmons v.
Galvin, 575 F.3d 24, 30 (1st Cir. 2009) (citing General Motors
Corp. v. Darling's, 444 F.3d 98, 107 (1st Cir. 2006)).  The Court
may consider "documents the authenticity of which are not
disputed by the parties; . . . documents central to plaintiffs'
claim; [and] documents sufficiently referred to in the
complaint."  Curran, 509 F.3d at 44 (quoting Watterson v. Page,
987 F.2d 1, 3 (1st Cir. 1993)) (alterations original); see also
Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 17 (1st
Cir. 1998) ("When . . . a complaint's factual allegations are
expressly linked to — and admittedly dependent upon — a document
(the authenticity of which is not challenged), that document
effectively merges into the pleadings and the trial court can
review it . . . .").

    **B.   MIT Has Presented the Court With an Actual Controversy**
    The Union contends that no actual controversy exists as

necessary under the Declaratory Judgment Act, 28 U.S.C. § 2201.
Opp'n 1.

Indeed, the Court ought grant declaratory judgment only if a
"controversy 'ripe' for judicial resolution" exists.  Verizon New
England, Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322, 651
F.3d 176, 188 (1st Cir. 2011) (citing Abbott Labs. v. Gardner,
387 U.S. 136, 148-49 (1967)).  According to First Circuit law, to
determine whether an actual controversy exists, a court ought
"consider both fitness for review and hardship," the former
involving "questions of finality, definiteness, and the need for
further factual development," and the latter being concerned with
"whether the challenged action create[d] a direct and immediate
dilemma for the parties."  Id. at 188 (quoting Ernst & Young v.
Depositors Economic Protection Corp., 45 F.3d 530, 535 (1st Cir.
1995)) (internal quotation marks omitted).  In Rhode Island v.
Narragansett Indian Tribe, 19 F.3d 685 (1st Cir. 1994), the First
Circuit held that courts ought consider whether granting
declaratory judgment would serve a "useful purpose."  Id. at 693.
Furthermore, as conceded by the Union, Opp'n 5, the First Circuit
has concluded in Tejidos de Coamo, Inc. v. Int'l Ladies' Garment
Workers' Union, 22 F.3d 8 (1st Cir. 1994), that the Norris-
LaGuardia Act, 29 U.S.C. § 101 et seq., does not prohibit pre-
arbitration declarations of arbitrability.  Tejidos de Coamo, 22
F.3d at 15.

Considering the history of this case, the Court is mindful of the fact that the issue of whether unescorted access denials are arbitrable is likely to arise again and this Court's decision in this case will hopefully aid judicial economy, clarify this particular issue, and thus help obviate similar disputes in the future.  Thus, an actual controversy exists.

**C.  The Issue of Arbitrability is a Question to be Decided by the Court.**

It is well settled that the issue of arbitrability, namely whether a particular grievance was excluded from arbitration, is a matter for a court to decide.  <u>AT&T Techs., Inc.</u> v. <u>Commc'ns Workers of Am.</u>, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").  In <u>Marie</u> v. <u>Allied Home Mortg. Corp.</u>, 402 F.3d 1 (1st Cir. 2005), the First Circuit reviewed then recent Supreme Court decisions reiterating that there were "at least two sorts of questions . . . presumptively for the <u>court</u> to decide: (1) whether the parties [were] bound by a given arbitration clause, and (2) whether a concededly binding arbitration clause applied to a particular type of controversy." <u>Id.</u> at 9-10 (quoting <u>Howsam</u> v. <u>Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 84 (2002)) (emphasis in original) (internal quotation marks omitted).  In making this decision, however, the Court

ought not decide the merits of the underlying claim.  AT&T
Techs., 475 U.S. at 649.

     **D.  MIT's Decision to Deny Unescorted Access Privileges is Subject to Arbitration Under the Agreement.**

       **1.  The Presumption of Arbitrability Governs**

Although it is an issue of first impression under this
collective bargaining agreement whether this particular grievance
- the denial of unescorted access to a nuclear facility - ought
be subjected to arbitration, there is well established case law
as to the common principles that guide the determination of
whether an issue is arbitrable or not.  See AT&T Techs., 475 U.S.
at 650.  Because interpreting an arbitration clause contained in
a collective bargaining agreement ultimately is a matter of
contract law, the parties will only be required to arbitrate the
issue if they agreed to submit such dispute to arbitration.  Id.
at 648-49 ("The first principle . . . is that arbitration is a
matter of contract and a party cannot be required to submit to
arbitration any dispute which he has not agreed so to submit.")
(citations omitted) (internal quotation marks omitted).

Having said that, there is a — possibly competing —
principle that where an agreement contains an arbitration clause,
the intent to arbitrate a particular grievance is presumed and
hence "[a]n order to arbitrate the particular grievance should
not be denied unless it may be said with positive assurance that

the arbitration clause is not susceptible of an interpretation
that covers the asserted dispute." United Steelworkers of Am. v.
Warrior & Gulf Nav. Co., 363 U.S. 574, 582-83 (1960).  This so-
called presumption of arbitrability is dictated by a clear
government policy favoring the resolution of such labor disputes
by means of arbitration and also demands that if in doubt the
Court ought interpret the agreement to have covered the issue.
Id.; see AT&T Techs., 475 U.S. at 650 (holding that the
presumption is "particularly applicable" in the case of a broad
arbitration clause, such as one submitting to arbitration "any
differences arising with respect to the interpretation of th[e]
contract or the performance of any obligation [t]hereunder . . .
.") (internal quotation marks omitted); see also Granite Rock Co.
v. Int'l Bhd. of Teamsters, 130 S. Ct. 2847, 2858-59 (2010)
(discussing application of the presumption of arbitrability).
The Supreme Court has likewise held that unless a particular
grievance is excluded from a general arbitration clause by
express provision, "only the most forceful evidence of a purpose
to exclude the claim from arbitration can prevail."  Warrior &
Gulf Nav. Co., 363 U.S. at 584-85.

    Applying these common principles to the case at hand, the
Agreement contains what the Court considers a "broad" arbitration
clause.  The arbitration clause in place covers "any grievance .
. . concerning the interpretation or application of [the]

Agreement." Agreement 4. MIT hotly disputes that the access denial grievance concerns the interpretation or application of the Agreement, arguing instead that it falls outside the scope of the Agreement. See Mem. Supp. 17-18.

It is not apparent why the question of whether the denial of Rice's site-access authorization does not concern the interpretation of the Agreement, namely the definition of "transfer" or "discipline" under the Agreement's Articles XVIII and XX respectively. In this regard, the Arbitrator's opinion that based on the facts of this particular case, the denial of access could well have constituted a disciplinary measure, Award 26-27, while not binding, persuades the Court. See McCabe Hamilton & Renny Co., Ltd. v. Int'l Longshore & Warehouse Union, Local 142, AFL-CIO, 624 F. Supp. 2d 1236, 1245-46 (D. Haw. 2008) (granting the union's motion to confirm the arbitration award and noting that the arbitrator acknowledged the employer's discretion to transfer the aggrieved but found that based on the facts of that case it was apparent that the employer used its discretion "as a means of disciplining [the aggrieved] without meeting the [collective bargaining agreement's] substantive and procedural requirements for discipline").

The absence of a specific provision does not necessarily equate to an intentional exclusion of a particular grievance or issue from arbitration. The failure specifically to regulate

14

site access in the Agreement may be due to any number of reasons,
yet faced with the strong presumption of arbitrability and having
failed to allege a reason to have intentionally abstained from
regulating the issue, let alone "forceful evidence of the purpose
to exclude," MIT cannot make its case.  See <u>Warrior & Gulf Nav.</u>
<u>Co.</u>, 363 U.S. at 585.

### 2.   The Presumption of Arbitrability Is Not Inapplicable Here Due to Public Policy

Having established that according to the general principles
of arbitration and labor contract interpretation the issue of
unescorted access to a nuclear facility is one to be submitted to
arbitration, the Court must consider MIT's argument that site
access denials fall outside the scope of the Agreement for public
policy reasons involving the safety and security of nuclear
facilities.  Mem. Supp. 17-19.  MIT points to two decisions, one
from the United States District Court for the District of New
Jersey, upheld by the Third Circuit Court of Appeals, and one in
which a labor arbitrator, acknowledging the New Jersey court's
reasoning, came to the same conclusion, namely that the issue of
revocation of access authorization was not arbitrable under the
applicable collective bargaining agreement.  <u>Public Serv. Elec. &</u>
<u>Gas Co.</u> v. <u>Int'l Bhd. of Elec. Workers Local 94</u>, 140 F. Supp. 2d
384, 401-02, 406 (D.N.J. 2001) <u>aff'd</u>, 27 Fed. App'x 127 (3d Cir.
2002); <u>In re WE Energies & Int'l Bhd. of Elec. Workers, Local</u>
<u>2150</u>, 122 Lab. Arb. (BNA) 1122, 2006 WL 2641749, at *8 (2012)

15

(Suntrup, Arb.).

The court in Public Service noted that the collective bargaining agreement in question did not contain any provisions "specific or otherwise, related to site access authorization determinations," 140 F. Supp. 2d at 398, and interwove this argument with a holding that due to the "unique and critical issue of the safety of the public at large" it was "necessary and appropriate" for the parties "to expressly agree to submit site access issues to arbitration and that this be specifically provided in the [collective bargaining agreement]," id. at 400. The Public Service court explained that it read the applicable Commission regulations to "permit arbitration to be the appeal process for revocation or denial of site access decisions," but "due to public policy reasons," required a "separate, clear, and specific provision in the collective bargaining agreement if arbitration is to be the review process." Id. at 403-04.  The court concluded that it would not uphold an agreement that lacked such provisions, as enforcement would be contrary to public policy.  See id. at 404.

Other courts examining the question of whether public policy justified an exception to arbitration on site access issues have come out a different way.  To make an argument that the Agreement was against public policy one has to determine the public policy behind the regulations, especially the regulatory history and the

16

Commission's intent.  The Seventh Circuit and district courts
therein have been concerned with the nuclear power plant site
access revocation issue after the terrorist attacks of September
11, 2001, and the resulting amendments of the Commission
regulations to tighten security.  <u>Exelon Generation Co., LLC</u> v.
<u>Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO</u>, No. 10 C 4846,
2011 WL 2149624, at *1 (N.D. Ill. May 25, 2011) (Gettleman, J.),
<u>rev'd and remanded</u>, 676 F.3d 566 (7th Cir. 2012), <u>reh'q en banc</u>
<u>denied</u>, 682 F.3d 620 (7th Cir. 2012); <u>see also</u> <u>Exelon Generation</u>
<u>Co.</u> v. <u>Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO</u>, No. 06 CV
6961, 2008 WL 4442608, at *1 (N.D. Ill. Sept. 29, 2008) (Lefkow,
J.).  In each of these cases, the court took great care to
analyze the regulatory history in search of a prohibition or
conflict with arbitration as a means of resolution of site access
disputes and held that the Commission had indeed intended to
permit arbitration procedures to exist alongside any review
mechanisms established pursuant to the regulations.  <u>See</u> <u>Exelon</u>
<u>Generation Co., LLC</u>, 676 F.3d at 574 (quoting Access
Authorization Program for Nuclear Power Plants, 56 Fed. Reg.
18997-01, 19002 (Apr. 25, 1991) (codified at 10 C.F.R. Part 73))
(citing from the regulatory guide the Commission's comment that
"the Commission never intended that any review procedure that
already exists in a bargaining agreement be abandoned."); <u>see</u>
<u>also</u> <u>id</u>. at 575 (holding that this interpretation remained in

17

force, even after the regulation was subsequently amended, as
"[n]othing in the text of the amended regulation or the
rulemaking history suggests the Commission came to a different
conclusion in 2009.").

Likewise, Judge Posner, in a concurrence to the denial of en
banc rehearing, noted that "[t]he Commission could amend its
regulations to forbid collective bargaining agreements to empower
arbitrators to resolve disputes over security clearances . . . .
As could Congress." Exelon Generation Co., 682 F.3d at 622
(Posner, J., concurring).  Judge Posner added that while it was
"time that the Commission, or failing that Congress, instituted
administrative review of decisions by private arbitrators
granting or denying security clearances to employees of nuclear
facilities," it was "beyond judicial authority to command" such
review procedures.  Id. at 622-23.

This Court is persuaded by the Seventh Circuit's approach.
While it is arguably in the public interest for a publicly
accountable judiciary to review site access disputes for our
nuclear facilities, it is not in fact the Commission's or
Congress's policy or intent to exclude access revocation disputes
from private (and largely secret) arbitration.  Thus, MIT's
policy argument must fail.

In addition, the Court takes note of the fact that the
Agreement in the version made available to the Court was in

18

effect from 2008 to 2011 and therefore was (re-)negotiated after MIT received the Commission's (April 2007) Order which it argues acts as a bar to arbitration of the site access issue.  Suffice it to say one would assume MIT, put on notice by the Order of its duties as a licensee to monitor site access and convinced that site access was not (or at least was no longer) a grievance arbitrable under the Agreement, would have asserted its rights by negotiating an explicit provision to that effect to the Agreement.

In conclusion, the presumption of arbitrability stands and can neither be overcome by MIT's public policy arguments nor by the facts alleged to be sufficient to create "forceful evidence" that the site access revocation grievance was intentionally unregulated by the Agreement.

### E.   A Permanent Injunction Is Not Warranted

MIT also seeks injunctive relief, asking the Court to enjoin the Union from "pursuing any claim in the arbitration relating to decisions to grant or deny authorization for unescorted access . . . ." Compl. ¶ 56.  As MIT is not entitled to a declaratory judgment that the unescorted access denial grievance is not arbitrable, the claim for such an injunction is moot.

### III. CONCLUSION

For the foregoing reasons, the Court

(1)  DENIES MIT's Motion for Judgment on the Pleadings and

request for declaratory judgment, ECF No. 20,

(2)  DENIES MIT's request for a permanent injunction, ECF
     No. 1; and

(3)  ORDERS the case administratively closed. It may be
     reopened upon motion of any party once the arbitration
     has concluded.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE